No. 25359

Lloyd A. Fry Roofing Company, a corporation v. The State of Colorado Department of Health Air Pollution Variance Board, and their successors in office from time to time; The State of Colorado Air Pollution Control Commission, and their successors in office from time to time; The Globeville Civic Association, Stapleton Community Buying Club (Inc.), NOD (Inc.), and United Swansea, Inc., and all of the members of each thereof as members of a class represented by the persons listed on Appendix 1 hereto

(499 P.2d 1176)

Decided July 31, 1972. Rehearing denied August 21, 1972.

224

Rothgerber, Appel & Powers, Ira C. Rothgerber, Jr., for plaintiff-appellant.

Duke W. Dunbar, Attorney General, John P. Moore, Deputy, William Tucker, Assistant, for defendants-appellees The State of Colorado Department of Health Air Pollution Variance Board and The State of Colorado Air Pollution Control Commission.

David Foster, for Colorado Department of Public Health.

Robert T. Page, Allan Reiver, Thomas Frank, for defendants-appellees The Globeville Civic Association, Stapleton Community Buying Club (Inc.), NOD (Inc.), and United Swansea, Inc.

*En Banc.*

MR. JUSTICE DAY delivered the opinion of the Court.

This is an appeal challenging the constitutionality of the Air Pollution Control Act of 1970 (1971 Perm. Supp., C.R.S. 1963, 66-31-1 *et seq.*), the propriety of certain administrative proceedings before the Air Pollution Variance Board, and the failure of the Colorado Air Pollution Control Commission to hold a review.

The proceedings herein were commenced under 1967 Perm. Supp., C.R.S. 1963, 66-29-1 *et seq.* Fry Roofing Company was notified by letter in September of 1969 that it was in violation of the provisions of the Air Pollution Control Act then in effect. In October 1969, the Department of

Health issued an order directing Fry to cease emitting air contaminants from its plant. Fry applied to the board for a variance.

The first hearing was held before the board on January 15, 1970. On April 10, 1970, an amended law designated as the "Air Pollution and Control Act of 1970" became effective. Thereafter, at a hearing on May 7, 1970, Fry agreed that the procedures required by the 1970 Act would govern the proceedings. Two subsequent hearings were had in July. At the conclusion of the July 16 hearing, the variance board denied Fry's request for a variance.

The variance board's written findings, conclusions and decision were entered on August 20, 1970. By letter dated September 9, Fry requested the commission to hold a hearing pursuant to Section 66-31-16(9). The commission refused. Thereafter Fry sought review in the district court and also combined with it a declaratory judgment action challenging the constitutionality of the 1970 Act on various grounds. The district court upheld the actions of the commission and the variance board and found the Act constitutional. We affirm.

## I.

With regard to the declaratory judgment, Fry first contends that the Act is void because of an alleged lack of adequate legislative standards, and that its provisions contain an unconstitutional delegation of legislative power to the commission. The determinations of these two questions are necessarily interrelated and, more accurately, present but a single question. *See Swisher v. Brown,* 157 Colo. 378, 402 P.2d 621.

■ A legislative enactment is presumptively valid, and one who challenges it bears an extremely heavy burden to establish its unconstitutionality beyond a reasonable doubt. *See Department of Health v. Owens-Corning Fiberglas Corp.,* 100 N J. Super. 366, 242 A.2d 21.

■ The 1970 Act was enacted under the police power, Section 66-31-2, and it cannot be doubted that control of air pollution is a legitimate subject of legislation thereunder.

*Department of Health v. Owens-Corning Fiberglas Corp., supra; People v. International Steel Corp.,* 102 Cal. App.2d 935, 226 P.2d 587; *City of Miami v. City of Coral Gables,* 233 So.2d 7, Fla.; *Board of Health v. N.Y. Cent. R. Co.,* 4 N. J. 293, 72 A.2d 511; *Penn-Dixie Cement Corp. v. City of Kingsport,* 189 Tenn. 450, 225 S.W.2d 270.

■ Also a statute must be read as a whole to ascertain whether adequate standards exist. *State Board v. Maddux,* 162 Colo. 550, 428 P.2d 936; *see State v. Arizona Mines Supply Co.,* 107 Ariz. 199, 484 P.2d 619; *Department of Health v. Owens-Corning Fiberglas Corp., supra.*

We set forth in the Appendix quotes from the 1970 Act which we deem pertinent to show the extent of the legislative standards set out in the Act.

■ We apply the test which was set out by the court in *Swisher v. Brown, supra,* to determine whether the Act contains adequate standards. In *Swisher v. Brown, supra,* it was declared that

"The legislature does not abdicate its function when it describes what job must be done, who must do it, and the scope of his authority."

*Accord, People v. Giordano,* 173 Colo. 567, 481 P.2d 415. This test recognizes that while the legislature may not totally abdicate its legislative authority, it may allow an agency to fill in the details of an enactment. *See State v. Arizona Mines Supply Co., supra.* It is impossible for the legislature to be absolutely precise in all fields in which it enters. *State v. Arizona Mines Supply Co., supra; Department of Health v. Owens-Corning Fiberglas Corp., supra; People v. Giordano, supra.* The following amplification is quoted from *Swisher v. Brown, supra:*

" * * * It is not necessary that the legislature supply a specific formula for the guidance of the administrative agency in a field where flexibility and adaption of the legislative policy to infinitely variable conditions constitutes the essence of the program. The modern tendency is to permit liberal grants of discretion to administrative agencies in order to facilitate the administration of laws dealing with

involved economic and governmental conditions. In other words, the necessities of modern legislation dealing with complex economic and social problems have led to judicial approval of broad standards for administrative action, especially in regulatory enactments under the police power. With respect to such types of legislation, detailed standards in precise and unvarying form would be unrealistic and more arbitrary than a general indefinite standard."

*Accord, People v. Gym of America, Inc.,* 177 Colo. 97, 493 P.2d 660; *Asphalt Paving Co. v. County Commissioners,* 162 Colo. 254, 425 P.2d 289.

In the 1970 legislation, the job to be performed is the development and maintenance of a comprehensive program for prevention, control, and abatement of air pollution throughout the entire state, including a program for control of emissions from all significant sources of air pollution, and the promulgation of ambient air goals for the state. The commission is to carry out this task, within the scope of authority and the guidelines set forth in the Act. The scope and guidelines to be followed by the commission in discharging its duties and responsibilities are those which are necessary or appropriate to foster the health, peace, safety, general welfare, convenience and comfort of the people of the state, and which facilitate the enjoyment of nature, scenery, and other resources of the state. *Compare People v. Giordano, supra.* Limitations on the commission are that ambient air standards must contain the items noted in Sections 66-31-7(1)(b) through (d), and the commission must consider the items noted in Sections 66-31-8(1)(b) through (h) in formulating emission control regulations.

Fry stresses the fact that, prior to the enactment of the new Act of 1970, the legislature set out precise air pollution standards in the 1969 law which was repealed. *See* 1969 Perm. Supp., C.R.S. 1963, 66-29-4 and 5. In our view, that change in the law in 1970 demonstrates the fact that there were too many variables to make the 1969 law effective and that precise standards in the area of air pollution enactments are impractical, if not impossible to administer.

Therefore, the legislature specifically noted commission-promulgated regulations may and sometimes must be formulated with regard to the various factors which either constitute, produce, or dispel air pollution, *e.g.,* classifying different types and degrees of air pollution; promulgating regulations applicable to either a part or the whole of the state; describing maximum concentrations of contaminants that can be tolerated depending on variations in altitude, topography, climate or meteorology; taking into consideration the degree to which any particular type of emission is subject to treatment; and considering the continuous, intermittent, or seasonal nature of the emission to be controlled.

In cases dealing with other areas of legitimate legislative activity where precision was determined to be impossible for the same or similar reasons noted in *Swisher v. Brown, supra,* such broad standards as "reasonable" and "necessary" have been found sufficient as standards, although incapable of precise definition. *Asphalt Paving Co. v. County Commissioners, supra; State v. Arizona Mines Supply Co., supra.* It has been said that the term "air pollution" in itself is a standard, albeit a broad one. *Department of Health v. Owens-Corning Fiberglas Corp., supra.*

We, therefore, conclude that the standards established in the Air Pollution Control Act of 1970 are not so broad as to result in an improper delegation of legislative authority, and that Fry Roofing Company has failed to meet its burden of overcoming the presumption of validity in this respect.

We next discuss the Fry Company's second argument — a corollary to the delegation question. Fry argues that the statute is so vague as to fail to apprise one of what conduct is necessary to avoid the "civil penalties" or injunctive relief provided under Sections 66-31-18 and 19. We do not so read the statute. The Act deals only with *future* conduct. *Cf. People v. Gym of America, Inc., supra.* Pursuant to Section 66-31-19(1)(b) or Section 66-31-18, neither a civil penalty can be imposed nor an injunction issue until after notice is given of the alleged violation. Thereafter, the Health

Department first attempts to obtain voluntary abatement of the pollutant, and a cease and desist order is issued. Even thereafter, numerous opportunities for stays are provided for in Sections 66-31-13(4) and 17(1). *See also* Laitos, *Institutional Response to An Environmental Crisis: The Failure of State Air Pollution Control,* 48 Denver L.J. 519 (1972). A civil penalty cannot be imposed nor injunctive relief granted until one violates a final cease and desist order, not subject to a stay pending review, which has been issued pursuant to the Act. Sections 66-31-19(1)(b) and 66-31-18.

Another section — 66-31-19(1)(c) — provides for a civil penalty for any one who fails, after July 1, 1970, to file an "air contaminant commission notice" prior to emitting such contaminants. Section 66-31-12 specifies the sources of emission in this regard, and section 66-31-3(2) defines "air contaminant" very precisely.

We conclude, therefore, that there are provided in the law adequate procedural safeguards to insure complete notice of conduct to be proscribed.

## II.

Next we consider Fry's appeal from the denial of a variance. One irregularity which Fry asserts was prejudicial error arose when a variance board member revealed the content of a telephonic conversation he had had with alleged air pollution control personnel in Minnesota. Fry had told the Board that air pollution control devices had been installed in its Minnesota plant, and that it desired the variance in Colorado to give it time to test the control device in Minnesota. The board member made a call to some one among that state's air pollution control personnel and reported at the hearing that the Minnesota contact had no knowledge of such an installation. Fry asserts, specifically, that it was denied the right of cross-examination by this procedure.

For the same reason, Fry also asserts that certain letters offered — only one of which was received into evidence — prejudiced its cause erroneously since the contents thereof were effectively "read" into the record by interveners. The

letters were to the effect that Fry was dragging its feet in the installation of acceptable air pollution control devices in several states where it has plants, that its Minnesota plant could not meet a 20% opacity limitation regarding visible emissions, that it has been cited and convicted several times of violations in Minnesota, and that the owner of Fry Roofing in Oregon is fighting extradition from Illinois.

We do not condone either the board member's actions or the attempt to inject irrelevant matters into the hearing, and we assume *arguendo* that Fry's objections were well-taken. Nevertheless, the error was not prejudicial because the variance board's findings were not based on nor related to any of this immaterial matter. The findings on which the variance was denied were on Fry's failure to make a case before the board. The board found, and the record so shows, that installation of air pollution control equipment in the Denver plant would not constitute an economic burden on Fry; that the technology is available to abate emissions from Fry's plant which are in violation of the Act; and that even after consultation Fry had not presented a definite plan for the installation of air pollution control equipment. The latter is a condition upon which the variance board relies to insure compliance in the reasonably foreseeable future, and Section 66-31-15(4) compels review of any variance granted at least annually to determine whether the control plan has been complied with and whether a continuance of the variance is justified.

III.

Fry next seeks a ruling by this Court that the refusal of the Pollution Control Commission to review the denial of the variance deprived Fry of its procedural rights to review in violation of Section 66-31-16(9). We do not read the statute as requiring any review by the commission when a variance is denied. The section seems clearly to provide that, upon granting of a variance, the commission must review the variance order to determine whether the variance granted " * * * interferes with the attainment of the objectives of [the Act] as set forth in section 66-31-2."

## IV.

■ Fry also contends that intervention by the civic associations was impermissible. We do not agree and hold Section 66-31-16(5) is clear that the right of such intervention is determinable only by the board or commission as the case may be. It reads:

"At any hearing, any person who is affected by the proceeding and whose interests are not already adequately represented, shall have the opportunity to be a party thereto upon prior application to and approval by the variance board or commission, *in its sole discretion*, as deemed reasonable and proper by said variance board and commission, and such person shall have the right to be heard and to cross-examine any witness." (Emphasis added.)

Absent the provision emphasized, the granting of intervention might be a discretionary decision by either the variance board or commission, which would be reviewable for abuse thereof. However, " * * * every word of a legislative enactment must be considered and effect be given thereto." *Woodmen of the World v. McCue,* 88 Colo. 209, 294 P. 947. It follows that the variance board or commission possesses unfettered and sole discretion as to granting intervention.

## V.

■ Fry's final contention is that the 1970 Act applies retroactively, and, therefore, constitutes an *ex post facto* law prohibited under Article II, Section 11 of the Colorado Constitution. Specifically, it is asserted that the variance board, in passing upon Fry's application for a variance, employed the emission standards of the 1970 Act.

While it is true that in its finding the variance board referred to the "emission standards of [the] Air Pollution Control Act of 1970," Fry stipulated at the May 1970 hearing that all proceedings would be controlled by the 1970 Act, which became effective the previous month. Section 66-31-24(1) provides:

"On or after April 10, 1970, the commission shall be deemed to have adopted temporary emission control regulations whose provisions are identical to the provisions of section

66-29-5(2) to (6), as those subsections existed on January 1, 1970, and such regulations shall be in full force and effect in each area of the state which was designated by the division pursuant to section 66-29-8(1)(c), as that paragraph existed on January 1, 1970, and such temporary emission control regulations shall remain in full force and effect until modified, altered, or revoked by the commission."

Clearly, the section refers to pre-1970 law for which Fry was given notice and on which it was cited for violation. The same conduct sought to be controlled by the cease and desist order in 1969 and the variance sought by Fry were not changed one iota by the repeal of the 1969 statute and the April 1970 effective date of the new Act. The commission did not prior to determination of the variance request either modify, alter, or revoke these temporary standards carried over into the 1970 Act. Thus, the pre-1970 standards are the only ones the variance board employed and are the ones Fry was on notice to meet from the inception of the proceedings.

The judgment is affirmed.

MR. JUSTICE HODGES and MR. JUSTICE ERICKSON not participating.

### APPENDIX

Section 66-31-2 provides the legislative declaration of "public policy" to be

" * * * to achieve the maximum practical degree of air purity in every portion of the state * * * to foster the health, welfare, convenience, and comfort of the inhabitants of the state * * * and to facilitate the enjoyment of nature, scenery, and other resources of the state * * *."

and the public purpose of the Act to be

" * * * to require the use of all available practical methods to reduce, prevent, and control air pollution throughout the entire state of Colorado, and to maintain a cooperative program between the state and local units of government"

in order to protect the health, peace, safety, and general welfare of the people of the state.

The commission is charged by Section 66-31-5 with the duty of developing and maintaining

*" \* \* \* a comprehensive program for prevention, control and abatement of air pollution throughout the entire state, including a program for control of emissions from all significant sources of air pollution, and [the promulgation of] ambient air goals for every portion of the state.* [and] *shall adopt and modify such plans for the implementation of such programs as may be necessary. Ambient air quality standards and emission control regulations shall be adopted and promulgated in accordance with sections 66-31-7 and 66-31-8."*

Additionally, by the provisions of Section 66-31-6, the commission is to

*" \* \* \* have maximum flexibility in developing an effective air pollution control program and may promulgate such combination of regulations as may be necessary or desirable to carry out the legislative purpose* set forth \* \* \*"*

above; may effect a

"[d]ivision [of]the state into such control zones or areas as may be necessary or desirable for effective administration of the \* \* \* program \* \* \*";

may classify and define different degrees or types of air pollution; and may adopt

"[e]mission control regulations that are applicable to the entire state, that are applicable only within specified areas or zones of the state, or that are applicable only when a specified class of pollution is present."

As noted above, the commission is to

*" \* \* \* adopt, promulgate, amend, and modify such stand-ards for the quality of ambient air as may be appropriate or necessary to carry out the purposes of [the Act]. \* \* \*"*

Section 66-31-7(1)(a).

"Ambient air" is defined in Section 66-31-3(5) as "the surrounding or outside air." Such ambient air standards must *" \* \* \* describe the maximum concentrations of specifically described contaminants that can be tolerated, consistent with the protection of the good health of the public at large, [but] may differ for different parts of the state as may be necessitated by variations in altitude, topography, climate, or*

*meteorology.* " Section 66-31-7(1)(b).

By another section such standards must

" * * * *describe the air quality goals that are to be achieved by control programs within specified periods of time; [but] may be either statewide or restricted to specified control areas.* " Section 66-31-7(1)(c).

Moreover, such standards must

" * * * *describe varying degrees of contamination of ambient air.* " Section 66-31-7(1)(d).

The commission is also under a duty to

" * * * *adopt and promulgate emission control regulations which require the use of effective practical air pollution controls for each and every significant source, potential source, and type of source of air contamination throughout the entire state* and thereafter may modify such regulations from time to time." Section 66-31-8(1)(a).

"Emission control regulation" is defined in Section 66-31-3(9) as

" * * * any standard promulgated by regulation which is applicable to all air contamination sources within a specified area and which prohibits or establishes permissible limits for specific types of emissions in such area, and also any regulation which by its terms is applicable to a specified type facility, process, or activity for the purpose of controlling the extent, degree, or nature of contamination emitted from such type of facility, process, or activity, and also any regulation adopted for the purpose of preventing or minimizing emission of any air contaminant in potentially dangerous quantities."

"Emission" is defined as

" * * * the discharge or release into the atmosphere of one or more air contaminants." Section 66-31-3(8).

"Air contaminant" is defined as

" * * * fumes, smoke, particulate matter, vapor, gas, or any combination thereof, but not including water vapor or steam condensate." Section 66-31-3(2).

In formulating emission control regulations, under the provisions of Sections 66-31-8(1)(b) through (h) the commis-

sion must consider

"(b) *The state policy regarding air pollution * * ***

"(c) *Federal recommendations;*

"(d) *The degree to which the concentrations of certain types of contaminants in certain portions of the state require that emission control regulations be more stringent than in other portions of the state;*

"(e) *The degree to which any particular type of emission is subject to treatment, the availability and feasibility of control techniques, and the extent to which the emission to be controlled is significant;*

"(f) *The continuous, intermittent, or seasonal nature of the emission to be controlled;*

"(g) *Whether the emission control regulation should be applied throughout the entire state or only in a specified portion of the state;*

"(h) *The need for specification of safety precautions that should be taken with respect to any source or potential source or type of source of air contamination.*" (Emphases added.)

We note certain chemicals and sources of air pollution which may be included in emission control regulations are specifically set out in Sections 66-31-8(2) and (3).