### No. 28407

**Colorado River Water Conservation District and Southwestern Colorado Water Conservation District v. The Colorado Water Conservation Board, Lee R. Enewold, Water Division Engineer, Division 5, and The City of Aspen, Colorado, and The Board of County Commissioners of the County of Pitkin, Colorado**

(594 P.2d 570)

Decided May 1, 1979.                    Rehearing denied May 21, 1979.

· Delaney & Balcomb, Kenneth Balcomb, Scott Balcomb, for objectors-appellants Colorado River Water Conservation District.

Maynes, Bradford & Duncan, Frank E. Maynes, for objectors-appellants Southwestern Colorado Water Conservation District.

J. D. MacFarlane, Attorney General, Richard F. Hennessey, Deputy, Edward G. Donovan, Solicitor General, David W. Robbins, Special Assistant, for applicant-appellee The Colorado Water Conservation Board.

Musick, Williamson, Schwartz, Leavenworth and Cope, P.C., Loyal E. Leavenworth, John D. Musick, Jr., for third party appellees The City of Aspen, Colorado and The Board of County Commissioners of the County of Pitkin, Colorado.

Ruth M. Wright, for amicus curiae The League of Women Voters of Colorado.

Musick, Williamson, Schwartz, Leavenworth and Cope, P.C., Alan E. Schwartz, for amici curiae Colorado Open Space Council, Colorado Wildlife Federation, National Wildlife Federation, Colorado Council of Trout Unlimited, Colorado Audubon Council, Crystal Valley Environmental Protection Association.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

This case involves three applications by the Colorado Water Conservation Board (Colorado Water Board) for minimum stream flow rights under an act commonly referred to as Senate Bill 97,[1] enacted by the General Assembly in 1973.[2] The Colorado River Water Conservation District and the Southwestern Water Conservation District (the Districts) objected. The water judge entered decrees as requested in the applications. The Districts appealed. We affirm.

The first three sections of Senate Bill 97, as they appear in Colo. Sess. Laws 1973, ch. 442, at 1521 and 1522, read as follows:[3]

"Section 1. 148-21-3(6), (7), and (10), Colorado Revised Statutes 1963 (1969 Supp.), are amended to read:

"148-21-3. Definitions. (6) 'Appropriation' means ~~the diversion of a certain portion of the waters of the state and~~ the application of ~~the same~~ A CERTAIN PORTION OF THE WATERS OF THE STATE to a beneficial use.

---

[1] Codified as subsections 37-92-102(3) and 37-92-103(3), (4) and (10), C.R.S. 1973.
[2] Colo. Sess. Laws 1973, ch. 442, at 1521.
[3] Capital letters indicate new material, and dashes through words indicate deletions.

"(7) 'Beneficial use' is the use of that amount of water that is reasonable and appropriate under reasonably efficient practices to accomplish without waste the purpose for which the ~~diversion~~ APPROPRIATION is lawfully made and, without limiting the generality of the foregoing, shall include the impoundment of water for recreational purposes, including fishery or wildlife. FOR THE BENEFIT AND ENJOYMENT OF PRESENT AND FUTURE GENERATIONS, 'BENEFICIAL USE' SHALL ALSO INCLUDE THE APPROPRIATION BY THE STATE OF COLORADO IN THE MANNER PRESCRIBED BY LAW OF SUCH MINIMUM FLOWS BETWEEN SPECIFIC POINTS OR LEVELS FOR AND ON NATURAL STREAMS AND LAKES AS ARE REQUIRED TO PRESERVE THE NATURAL ENVIRONMENT TO A REASONABLE DEGREE.

"(10) 'Priority' means the seniority by date as of which a water right is entitled to ~~divert~~ USE or conditional water right will be entitled to ~~divert~~ USE and the relative seniority of a water right or a conditional water right in relation to other water rights and conditional water rights deriving their supply from a common source.

"Section 2. 148-21-2. Colorado Revised Statutes 1963 (1969 Supp.), is amended BY THE ADDITION OF A NEW SUBSECTION to read:

"148-21-2. Declaration of policy. (3) Further recognizing the need to correlate the activities of mankind with some reasonable preservation of the natural environment, the Colorado water conservation board is hereby vested with the authority, on behalf of the people of the state of Colorado, to appropriate in a manner consistent with sections 5 and 6 of article XVI of the state constitution, or acquire, such waters of natural streams and lakes as may be required to preserve the natural environment to a reasonable degree. Prior to the initiation of any such appropriation, the board shall request recommendations from the division of wildlife and the division of parks and outdoor recreation. Nothing in this article shall be construed as authorizing any state agency to acquire water by eminent domain, or to deprive the people of the state of Colorado of the beneficial use of those waters available by law and interstate compact."

The applications were made under the authority of these sections. They embraced three segments of the Crystal River and its tributary, Avalanche Creek, which lie in Gunnison, Pitkin and Garfield Counties. One segment (No. 1) consists of Avalanche Creek from its confluence with Hell Roaring Creek to its confluence with the Crystal River. A second segment (No. 2) encompasses the Crystal River from its confluence with Carbonate Creek (near Marble) to its confluence with Avalanche Creek (below Redstone); and the third (No. 3) includes the Crystal River from its confluence with Avalanche Creek to its confluence with the Roaring Fork River. The Colorado Water Board asked and was granted the following awards:

*Cubic Feet Per Second of Time*

|  | October 1 to April 30 | May 1 to September 30 |
|---|---|---|
| No. 1 | 10 | 22 |
| No. 2 | 40 | 80 |
| No. 3 | 60 | 100 |

Following the enactment of Senate Bill 97 the Colorado Water Board requested recommendations from the Colorado Division of Wild Life (DOW) and the Colorado Division of Parks and Outdoor Recreation (DPOR). After making studies DOW submitted its recommendation to the Colorado Water Board for water flows for maintenance of fisheries. The DPOR did not make a separate study, but advised the Colorado Water Board that it concurred in the recommendations of DOW and that it had determined that the minimum flows recommended by DOW were adequate for other parks and outdoor recreation purposes. Thereafter, the Colorado Water Board filed its applications.[4]

The Districts urge the following four arguments:

I. Senate Bill 97 is unconstitutional, and the decreed priorities are void, because a requirement of a physical diversion is absent.

II. The water court erred in not limiting the awards to "waters available by law and interstate compact."

III. Senate Bill 97 is unconstitutionally vague and makes an impermissible delegation of legislative authority to the Water Board.

IV. The Water Board failed to establish the quantity of water necessary to "preserve the natural environment to a reasonable decree."

I.

Historically, with little exception it has been the rule that an appropriation is to be made by (1) diverting the water and (2) placing it to a beneficial use. A diversion has been conventionally considered the act of taking water from a stream and transporting it to another location for use. Until the legislature in 1969 specifically made diversion an essential element of appropriation,[5] *diversion* was a court-made element. Examples of this principle are to be found in the footnote.[6]

As to appropriation of water, the Colorado Constitution uses the word "divert" only once; and here it was not used to mandate an essential element of appropriation. The sole time it appears as to water is in *Colo. Const.* Art. XVI, § 6: "The right to divert the unappropriated waters of

---

[4] The statement was made at oral argument that other similar applications have been filed by the Water Board as to other streams.

[5] 1969 Perm. Supp., C.R.S. 1963, 148-21-3(6).

[6] *Lamont v. Riverside District,* 179 Colo. 134, 498 P.2d 1150 (1972); *Colorado River District v. Rocky Mountain Power Company,* 158 Colo. 331, 406 P.2d 798 (1956); *Denver v. Miller,* 149 Colo. 96, 368 P.2d 982 (1962); *Denver v. Northern Colorado District,* 130 Colo. 375, 276 P.2d 992 (1954); and *Board of Commissioners v. Rocky Mountain Water Company,* 102 Colo. 351, 79 P.2d 373 (1938).

any natural stream to beneficial uses shall never be denied." The reason and thrust for this provision was to negate any thought that Colorado would follow the riparian doctrine in the acquisition and use of water. In 1883, early in the history of this state, this court in *Thomas v. Guiraud,* 6 Colo. 530, rejected the argument that Guiraud's appropriation was invalid because he had constructed no ditches. Less than three years later in *Larimer Co. v. Luthe,* 8 Colo. 614, 9 P. 794 (1886), we find this court saying:

"The maxim, *Expressio unius est exclusio alterius,* is here invoked. It is claimed that when the constitution recognizes the right to appropriate water by diversion, it excludes the appropriation thereof in any other manner. Further, that the word 'divert' means to take or carry it away from the bed or channel of the stream; that therefore respondent's act of utilizing a natural reservoir in the bed of the stream, and thus storing surplus water for future use, not being a diversion in the sense of the constitutional provision cited, is in conflict therewith.

"We are not prepared to concede the correctness of counsel's position. It is our opinion that the above is not the most natural and reasonable view to adopt concerning the meaning of the constitution. The word 'divert' must be interpreted in connection with the word 'appropriation,' and with other language used in the remaining sections of that instrument referring to the subject of irrigation. *We think there may be a constitutional appropriation of water without its being at the instant taken from the bed of the stream.* This court has held that 'the true test of the appropriation of water is the successful application thereof to the beneficial use designed, and the method of distributing or carrying the same, or making such application, is immaterial.' *Thomas v. Guiraud et al.,* 6 Colo. 530." (Emphasis added.)

Many of the early settlers in this region came from places in the east and Europe where the use of water was controlled by the owners of the land through which the stream ran. In our arid area, there could be little agriculture or other development upon the non-riparian lands absent a doctrine permitting transportation to them of water from the streams. This was a prime necessity for this new country, and the right so to develop was assured and guaranteed by this "right to divert" provision of our constitution. *Coffin v. Left Hand Ditch Co.,* 6 Colo. 443 (1882).

Idaho has a similar constitutional provision. Its supreme court has held "that our constitution does not require actual physical diversion." *State Dept. of Parks v. Dept. of Water Admin.,* 96 Idaho 440, 530 P.2d 924 (1974). The Idaho court there cited *Genoa v. Westfall,* 141 Colo. 533, 349 P.2d 370 (1960).

Four years following the adoption of our constitution, the General Assembly enacted the "Meadow Act," which still remains on our statute books. Section 37-86-113, C.R.S. 1973. This act permits a valid

appropriation without a headgate or ditch of natural overflow waters with the right to construct a ditch for the taking of such water with the same priority when the stream subsides. It is apparent that members of the General Assembly, acting so shortly after the adoption of the constitution, did not agree that it *est exclusio alterius.* Rights acquired under the "Meadow Act" were upheld in *Humphreys Tunnel Co. v. Frank,* 46 Colo. 524, 105 P. 1093 (1909); and *Broad Run Inv. Co. v. Deuel Co.,* 47 Colo. 573, 108 P. 755 (1910).

In 1886 this court considered the question of whether storing surplus water in a natural reservoir in the bed of a stream was adequate for an appropriation. *Larimer Co. Reservoir Co. v. Luthe, supra.* It was argued that, when the constitution recognized the right to appropriate water by diversion, it excluded appropriation by any other means; and further that the word "divert" meant to carry the water *away* from the bed or channel of the stream. The court rejected both of these arguments in upholding a valid appropriation.

In 1969 the first statutory requirement of diversion came into being:
"(5) 'Diversion' or 'divert' means removing water from its natural course or location, or controlling water in its natural course or location, by means of a ditch, canal, flume, reservoir, bypass, pipeline, conduit, well, pump, or other structure or device.
"(6) 'Appropriation' means the diversion of a certain portion of the waters of the state and the application of the same to a beneficial use." 1969 Perm. Supp., C.R.S. 1963, 148-21-3.

In 1973, four years later, the General Assembly made the modification here involved. It deleted the diversion requirements from the definition of an appropriation and at the same time in S.B. 97 enacted:
"For the benefit and enjoyment of present and future generations, 'beneficial use' shall also include the appropriation by the state of Colorado in the manner prescribed by law of such minimum flows between specific points or levels for and on natural streams and lakes as are required to preserve the natural environment to a reasonable degree."

In *Colo. River Dist. v. Rocky Mountain Power Co.,* 158 Colo. 331, 406 P.2d 798 (1965), the Colorado River Water Conservation District played a somewhat different role. This District was created by statute in 1937 and was given the power, among others,
"To file upon and hold for the use of the public sufficient water of any natural stream to maintain a constant stream flow in the amount necessary to preserve fish, and to use such water in connection with retaining ponds for the propagation of fish for the benefit of the public;" Section 37-46-107(1)(j).
Under this power it brought the action to preserve and keep water in the stream to the extent necessary for the preservation of fish life.

This court affirmed the dismissal of the District's claims. The court considered this as an attempted appropriation of "a minimum flow of water . . . for piscatorial purposes without diversion." The opinion continues.

"By the enactment of [the statutory power quoted above] the legislature did not intend to bring about such an extreme departure from well established doctrine, and we hold that no such departure was brought about by said statute."

Without at this juncture commenting upon the subject of "minimum flow," it is obvious that the General Assembly in the enactment of S.B. 97 certainly did intend to have appropriations for piscatorial purposes without diversion.

■ We hold that under S.B. 97 the Colorado Water Board can make an in-stream appropriation without diversion in the conventional sense. We wish to emphasize that we are not hereby causing any erosion of the many opinions of this court, some of which are cited above, holding that a diversion is an essential element of the water appropriations involved in those cases. The many cases are distinguishable. Several really had no issue as to diversion. Others involved (1) a diversion (proposed or actual), (2) a beneficial use (involved or contemplated) clearly requiring a diversion, (3) situations in which the evidence and measurement of an appropriative intent could be predicated upon only the capacity to divert, (4) circumstances where there could not be a bona fide appropriation without a physical diversion, or (5) matters in which a lack of diversion violated the principle of maximum utilization enunciated in *Fellhauer v. People,* 167 Colo. 320, 447 P.2d 986 (1968), and *Colorado Springs v. Bender,* 148 Colo. 458, 366 P.2d 552 (1961).

*Colo. Water Dist. v. Rocky Mountain Power Co., supra,* involved a situation which this court found to be an appropriation of *minimum flow of water* and, consequently, a forbidden riparian right. Irrespective of how the court as presently constituted might decide this issue, the opinion as there written is clearly distinguishable from the statute and claims here under consideration.

The crucial consideration is that this court has never decided a case such as this on a constitutional basis. We overrule nothing in now holding that S.B. 97 is not unconstitutional in this respect.

II.

The last sentence of Senate Bill 97 reads:

"Nothing in this article shall . . . deprive the people of the state of Colorado of the beneficial use of those waters available by law and interstate compact."

The Districts contend that the provision mentioning "waters available by law" means that later junior appropriators may have their rights adjudicated, which rights will be superior to those here decreed to the

Colorado Water Board. Further, the Districts suggest that this wording means that the only awards the Colorado Water Board may receive are to water already adjudicated to senior appropriators downstream.

■ We do not agree with either of these two contentions. The legislative intent is quite clear that these appropriations are to protect and preserve the natural habitat and that the decrees confirming them award priorities which are superior to the rights of those who may later appropriate. Otherwise, upstream appropriations could later be made, the streams dried up, and the whole purpose of the legislation destroyed.

We simply cannot follow the logic of the second contention to the effect that the Colorado Water Board is entitled only to water already appropriated by downstream seniors. We fail to see how downstream appropriators are going to be affected by the Colorado Water Board's decrees, nor any reason for so circumscribing the effect of the legislation.

We admit that we are puzzled as to the reason the General Assembly placed this clause in the Act. Perhaps later circumstances and cases may clarify our curiosity in this respect. We are not, however, puzzled concerning our ruling as to what the General Assembly did *not* intend. It did not intend the construction urged by the Districts.

The Water Judge stated:
"There was no evidence that these appropriations resulted in any people of the State of Colorado being deprived of the beneficial use of water. Until such time as a person is in fact deprived of the beneficial use of available water because of these appropriations the alleged harm is purely speculative and must be rejected."

We approve of this statement as it relates to the deprivation of water available by "interstate compact." We have already spoken as to the remainder of the clause and see no need to comment on the Water Judge's statement as it related to "available by law."

### III.

The third issue concerns the constitutionality of the legislative delegation of power to the Colorado Water Board. The Districts contend that the statutory language[7] empowering the Colorado Water Board to "appropriate . . . such waters of natural streams and lakes as may be required to preserve the natural environment to a reasonable degree" is unconstitutionally vague and, therefore, an impermissible delegation of authority. *Colo. Const.,* Art. III.

■ The Districts correctly note that the issues of vagueness and delegation are considered in Colorado as aspects of the same question. *Fry Roofing v. Dept. of Health,* 179 Colo. 223, 499 P.2d 1176 (1972). "The legislature does not abdicate its function when it describes what job must

---

[7] The language appears in sections 37-92-102(3) and 37-92-103(3), (4) and (10), C.R.S. 1973.

be done, who must do it, and the scope of his authority." *Swisher v. Brown,* 157 Colo. 378, 402 P.2d 621 (1965). The legislature must make the law even though "it may delegate the power to determine some fact or state of things to effectuate the purpose of the law." *People v. Giordano,* 173 Colo. 567, 481 P.2d 415 (1971).

The Districts rely upon the fact that the General Assembly did not define the phrase "natural environment," nor specify what it meant by requiring "such minimum flows as are required to preserve the natural environment to *a reasonable degree.''* (Emphasis added.) The Districts argue that such definition and specification are insufficient here since the terms do not have any commonly accepted meaning. In this respect, they contend that the instant delegation differs from those approved in *Giordano, supra,* and *Swisher, supra,* where the legislative directives could be interpreted in light of objective scientific and economic standards.[8]

While we agree that the standards set forth call for evaluations by biologists rather than assessments regarding public health or economics, we cannot agree that the standards are not such as could be implemented by agencies having specific expertise regarding the preservation of flora, fauna and other aspects of the natural environment. Nor do we believe that the term "natural environment," anymore than similar terms commonly coined such as "natural resources," is so vague that it does not indicate the task which the General Assembly intended the Colorado Water Board to accomplish.

To require an enumeration of the forms of plant and animal life, as well as natural formations, which the legislature wished to preserve would be to impose an impossible task. The legislative objective is to preserve reasonable portions of the natural environment in Colorado. Factual determinations regarding such questions as which areas are most amenable to preservation and what life forms are presently flourishing or capable of flourishing should be delegated to an administrative agency which may avail itself of expert scientific opinion. This is particularly true, considering that the General Assembly undoubtedly anticipated that the considerations for each locale might vary. Indeed, the Districts assert this as to the environs of the three stream segments here in question.

Moreover, combining the legislative directive to preserve the natural environment with the power to appropriate minimum stream flows narrows the delegation so that it involves only that part of the natural environment where survival is affected by stream flow and lakes.

The Districts argue that one indication that the term "natural environment" is vague is that the Colorado Water Board is considering

---

[8] *Giordano, supra,* concerned sanitary regulations promulgated by the Colorado Department of Health; and *Swisher, supra,* was interpreting the Colorado Agricultural Marketing Act of 1939 which employed such terms as "orderly marketing," "uniform grading" and "economic waste."

preservation of five nonindigenous fish species which are now in the stream segments: Colorado River Whitefish and Cutthroat, Rainbow, Eastern Brook and Brown Trout. They claim that these species should not be considered "natural." The parties' stipulation of facts states that related species of fish have existed in the streams in question in recent years, but have been destroyed due to natural or man-related causes. All of the existing species are naturally reproducing in the stream systems, except some stocking is necessary for the Rainbow.

We think the Districts' interpretation of "natural" is strained. The General Assembly clearly intended to have the Colorado Water Board preserve various life forms. To consider the introduction of desirable life forms as improper substitutes for former fish species that no longer exist, would inhibit accomplishment of the legislative goal.

In addition to the contention that the term "natural environment" is vague, the Districts object to the General Assembly's failure to define what it meant by the phrase "to a reasonable degree." In this regard, we note a conclusion reached in *Fry Roofing, supra:*

"In cases dealing with other areas of legitimate legislative activity where precision was determined to be impossible . . . such broad standards as 'reasonable' and 'necessary' have been found sufficient as standards, although incapable of precise definition."

This describes the type of situation we are here considering. As indicated above, precision of the type which the Districts espouse would be impracticable under the circumstances. For example, the Districts urge that the General Assembly could have mandated preservation of the "existing environment" and achieve the degree of specificity required by the constitution. The present statute, however, meets constitutional standards to permit leeway to proceed rationally in light of factual studies which might show that certain existing life forms would require inordinate support to survive.

■ We conclude that the General Assembly has established "what job must be done" with sufficient clarity. It also has answered "who must do it" since it is specifically the Colorado Water Board which is authorized to appropriate waters to accomplish the legislative purpose. It has sufficiently described the scope of the Colorado Water Board's authority. Thus, under the standard adopted in *Swisher, supra,* and followed in succeeding cases, Senate Bill 97 is not void for vagueness, nor an improper delegation of legislative authority.

The Districts also complain of the Colorado Water Board's activities in accomplishing its delegated duties. As mentioned, DPOR did not make an independent study, but submitted that the minimum flows for fish would be adequate to preserve the remainder of the natural environment.

The Colorado Water Board adopted the assumption that, in order to protect the environment to a reasonable degree, it would be sufficient to

appropriate minimum flows that would maintain the existing aquatic habitat and related fish production. Nowhere is it shown that such an assumption was unfounded or irrational. The Colorado Water Board made the assumption on the basis of an extensive report by DOW and on the strength of DPOR's conclusions that the minimum flows recommended by DOW were adequate for other parks and outdoor recreation purposes.

█ It is to be presumed that the Colorado Water Board carried out its duty under the statute. *Colorado Springs v. District Court,* 184 Colo. 177, 519 P.2d 325 (1974). That assumption must stand in the absence of evidence that there is no rational connection between preservation of existing fish species and related fish production by minimum stream flows and preservation of the natural environment.

We find the appellant's arguments as to the impropriety of the delegation unmeritorious.

## IV.

█ Finally, the Districts contend that the Water Board has not abided by the terms of its delegated authority in establishing the quantity of water necessary to "preserve the natural environment to a reasonable degree." They make four allegations in support of this contention: (1) that the beneficial uses contemplated are not such as would support an appropriation under the constitution; (2) that the Colorado Water Board did not comply with the statutory requirement that it request recommendations from DPOR and DOW; (3) that the Colorado Water Board failed to show that it complied with the requirement that its appropriations not "deprive the people of the State of Colorado of the beneficial use of those waters available by law and interstate compact"; and (4) that the Colorado Water Board acted only to preserve fish life rather than the entire natural environment as the statute requires.

Regarding the first point, the Districts concede that the in-stream uses contemplated are indeed beneficial. They only question whether the constitution permits appropriations for beneficial uses that do not entail diversions. This question has been answered above in part I.

The parties' stipulation establishes that the Colorado Water Board did request recommendations from DOW and DPOR. The fact that DPOR adopted the recommendations of DOW without making an independent study does not show that the Colorado Water Board did not make the requests required by Senate Bill 97. Thus, the Districts' second allegation is also without merit.

The third allegation has been considered in part II above.

The final allegation also related to a matter already discussed in part III. As noted, the Colorado Water Board determined that appropriation of the minimum flows necessary to preserve certain fish species also would suffice to maintain the rest of the natural environment. This determination was based on the Colorado Water Board's considerations, including review

of DOW's reports and DPOR's comments. The Districts have not shown that the Colorado Water Board's conclusion was at all unfounded or arbitrary.

We conclude that the Colorado Water Board did abide by the terms of its delegated authority in establishing the quantity of water necessary to accomplish the purposes of Senate Bill 97.

Judgment affirmed.

MR. JUSTICE LEE and MR. JUSTICE CARRIGAN do not participate.