COLORADO–UTE ELECTRIC ASSOCIA-
TION, INC., Plaintiff-Appellant,

v.

The AIR POLLUTION CONTROL COM-
MISSION OF the COLORADO DE-
PARTMENT OF HEALTH, Dr. James
Lodge, Dr. John Cobb, Mitchell Sim-
mons, Gerald Jensen, Dr. Val Veirs, La-
boyta Garnand, Charles McAfee, Dr.
David Kelble, Vinton Pierce, Commis-
sioners, and Their Successors in Office
From Time to Time, the Air Pollution
Control Division of the Colorado De-
partment of Health, the Colorado De-
partment of Health, Dr. Edward G.
Dreyfus, Executive Director, Environ-
mental Defense Fund, Defendants-Ap-
pellees,

and

Colorado Association of Commerce and In-
dustry, Public Service Company of Colo-
rado, Ideal Basic Industries, Inc., City of
Colorado Springs, Defendants-Cross-
Claimants-Appellants,

and

Tri-State Generation & Transmission As-
sociation, Inc., Intervenor-Appellant.

No. 77–662.

Colorado Court of Appeals,
Div. II.

Nov. 27, 1981.

As Modified on Denial of Rehearing
Jan. 7, 1982.

Certiorari Granted July 12, 1982.

Holland & Hart, Robert T. Connery, Helen Marsh, Denver, for plaintiff-appellant Colorado-Ute Elec. Ass'n, Inc., Ideal Basic Industries, Inc., Colo. Ass'n of Commerce & Industry, and Tri-State Generation & Transmission Ass'n, Inc.

J. D. MacFarlane, Atty. Gen., David W. Robbins, Deputy Atty. Gen., Edward G. Donovan, Sp. Asst. Atty. Gen., Gregory J. Hobbs, Jr., First Asst. Atty. Gen., Hubert A. Farbes, Jr., Janet Lee Miller, Asst. Attys. Gen., Denver, for State defendants.

David C. Mastbaum, Denver, for defendant Environmental Defense Fund.

Tad S. Foster, Gordon D. Hinds, Colorado Springs, for City of Colorado Springs.

Kelly, Stansfield & O'Donnell, Timothy J. Flanagan, Denver, for Public Service Co. of Colo.

SMITH, Judge.

The ultimate issue in this appeal is whether the Colorado Air Pollution Control Commission has the authority to make compliance with ambient air quality standards a

condition to the continued validity of permits to operate electric power generation plants. We hold that it does not and therefore reverse the trial court judgment to the contrary.

The Colorado Air Pollution Control Commission is an administrative agency created under the Air Pollution Control Act of 1970, now codified at § 25–7–101 et seq., C.R.S. 1973. The Commission has the power to adopt, promulgate, amend, and modify ambient air standards and emission control regulations. The Air Pollution Control Division of the Department of Health (Division) has the statutory duty of administering and enforcing the programs and regulations adopted by the Commission.

Plaintiff-appellant, Colorado-Ute Association, Inc., defendant-cross-claimant-appellants, Ideal Basic Industries and Colorado Association of Commerce and Industry, as well as intervenor-appellant, Tri-State Generation & Transmission Association, Inc., are all represented here by the same counsel, and assert, despite the various means by which they have become parties to this action, essentially the same arguments in this appeal. Disposition of Colorado-Ute's arguments also resolves their respective assertions.

Defendants-cross-claimants-appellants, Public Service Company of Colorado and the City of Colorado Springs have requested that they be dismissed from this appeal. No objection having been received, such an order has been entered.

Defendant-appellee, Environmental Defense Fund, has, through counsel, advised the court that it deems the issues on appeal moot, and it did not participate in oral arguments or otherwise on appeal.

On or about November 13, 1975, the Commission adopted Air Pollution Control Commission Regulation Number 3 governing, *inter alia*, the issuance of air contaminate emission permits. Section II.H.1.a thereof became effective January 19, 1976, and read as follows:

"1. The Division shall grant an emission permit if and when it determines that: a. The direct source will meet rules and

regulations of the Commission and would not interfere with the attainment or maintenance of applicable federal and state ambient air quality standards and any more stringent local ambient air quality air standards."

On March 10, 1975, prior to adoption of this regulation, the Division issued a permit to Colorado-Ute authorizing construction of the coal-fired Craig Generating Station Units One and Two. The Division inserted a condition in the permit requiring continuous compliance by Colorado-Ute with state and federal ambient air quality standards.

Colorado-Ute immediately commenced efforts to obtain from the Division a modification of the permit which would eliminate the requirement that they comply with state ambient air quality standards which were more stringent than those adopted by the federal government. This request was refused on May 7, 1975. On December 18, 1975, after adoption of the Regulation in question, Colorado-Ute again requested modification of the construction permit from the Division and was again refused. This decision was appealed to the Commission on May 27, 1976. On September 9, 1976, the Commission upheld the Division and entered its order directing the Division to proceed with issuance of *operating* permits without the necessity of any additional applications from Colorado-Ute. However, issuance of the operating permits, like the construction permits, was conditioned upon future continuing compliance with the stricter state ambient air quality standards.

## I

Appellees contend that appellants may not here litigate the conditions in their permit because they failed to exhaust the available administrative remedies, specifically an appeal of the Division's initial decision to the Commission within sixty days of the issuance of the construction permit.

Colorado-Ute here challenges the authority of the Commission to impose ambient air quality standards as a condition to the continuing validity of its operating permit.

The answer to this challenge, however, ultimately involves interpretation of the Commission's enabling statute.

■ Because it is the province of the court to interpret and determine the limits of organic enabling legislation, *Social Security Board v. Nierotko*, 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718 (1945); *J. B. Montgomery, Inc. v. U. S.*, 206 F.Supp. 455 (D.Colo.1962), *aff'd*, 376 U.S. 389, 84 S.Ct. 884, 11 L.Ed.2d 797 (1964), exhaustion of administrative remedies as a prerequisite to judicial review is not required when the issues presented to the court depend upon such interpretation. *State of Colorado v. Veteran's Administration*, 430 F.Supp. 551 (D.Colo.1977), *aff'd*, 602 F.2d 926 (10th Cir. 1979), *cert. denied*, 444 U.S. 1014, 100 S.Ct. 663, 62 L.Ed.2d 643 (1980); *See also Skinner & Eddy Corp. v. U. S.*, 249 U.S. 557, 39 S.Ct. 375, 63 L.Ed. 772 (1919).

> "[The] requirement of exhaustion of administrative remedies does not apply when, as here, the administrative officer or body acts without the scope of his or its defined statutory authority. The question here involved, being strictly one of law, is for the courts and an appeal to the Board of Examiners would have been futile and useless."

*Walker Bank & Trust Co. v. Taylor*, 15 Utah 2d 234, 390 P.2d 592, 595 (1964); *Cf. People ex rel. Commissioner of Agriculture v. Webster*, 40 Colo.App. 144, 570 P.2d 560 (1977).

■ Where as here, the Commission itself refused to modify the construction permit, and ordered the issuance of an operating permit containing the same objectionable conditions, further appeal to the Commission would be futile. *See Jackson v. State of Colorado*, 294 F.Supp. 1065 (D.Colo. 1968). The only question at issue here is whether the statute gave the Commission the authority to impose the challenged conditions. This question can only be resolved by the courts.

## II

■ Appellees argue that this appeal should be dismissed as moot, because those portions of § II.H.1 of Regulation 3, requiring compliance with state and local ambient air quality standards were repealed on June 5, 1980. Appellees are correct insofar as Colorado-Ute's challenge to the regulation itself is concerned. However, § 25–7–114(4)(k), C.R.S.1973 (1980 Cum.Supp.) gives continuing legal effect to conditions imposed pursuant to subsequently repealed regulations. The contested conditions contained in the operating permit issued for Craig Stations 1 and 2 were not therefore removed, or obviated, by repeal of the applicable portions of § II.H.1. Colorado-Ute's objection to the requirement that it comply with state and local ambient air quality standards in order to avoid revocation or suspension of its permit remains viable because Colorado-Ute is still bound by these conditions. This case then clearly presents a challenge to the authority claimed by the Commission under its enabling legislation. *See Flavell v. Department of Welfare*, 144 Colo. 203, 355 P.2d 941 (1960); *Rodgers v. Atencio*, 43 Colo.App. 268, 608 P.2d 813 (1979).

## III

■ Being creatures of statute, administrative agencies must act only within the authorization of their organic legislation. *Travelers Indemnity Co. v. Barnes*, 191 Colo. 278, 552 P.2d 300 (1976); *Big Top, Inc. v. Schooley*, 149 Colo. 116, 368 P.2d 201 (1962). Thus we must determine, from an analysis of the statute, whether the Commission has the authority to require compliance with ambient air quality standards as a *condition* to issuance and continued existence of a permit. We conclude that the Commission does not have the authority to suspend or revoke a permit, already issued, for failure of the permittee to meet ambient air quality standards.

Permit issuance is governed by § 25–7–112(4)(d). That section reads as follows:

> "The division *shall* grant the permit unless it determines that the proposed project or activity would not meet applicable emission standards or regulations of

the Commission, or would interfere with the attainment or maintenance of the then existing federal primary or secondary ambient air standards."

In using the word "shall," the General Assembly restricted the Division's discretion in this matter. *City of Colorado Springs v. Street,* 81 Colo. 181, 254 P. 440 (1927). Unless it determines that the proposed activity (1) would not meet applicable emission standards or regulations of the Commission or (2) would interfere with the attainment or maintenance of the then existing federal primary or secondary ambient air quality standards, the Division is required to issue the permit. That is, assuming the emission source can comply with emission standards and regulations, the Division may make one of two choices; denial of the permit because it has determined that the source would interfere with the attainment or maintenance of ambient air standards, or issuance of the permit if it determines that the source, if operated in compliance with applicable emission standards and regulations, would not interfere with the attainment or maintenance of ambient air standards.

■ Once the Division has determined that a proposed project or activity will not hinder achievement of ambient air quality standards, the Act compels it to issue a permit. The Act does not authorize the transfer to the individual permittee of the Commission's responsibility for seeing that ambient air quality standards are achieved.

■ The exhaustive testimony in the record demonstrates the logical basis which, we believe, caused the General Assembly to draw the distinction between ambient air standards as goals, and the imposition of specific operating requirements to be imposed as conditions of operation upon each permittee. Point source emissions, such as those in question here, can be monitored and controlled by currently available technology. Thus, conformity or non-conformity with "emission standards" by a particular permittee can be determined and enforced. However, a violation of an "ambient air quality standard," by a specific

permittee is difficult, if not impossible, to determine.

While emissions can be precisely measured to determine how much specific pollutant a single source ejects into the atmosphere in a given time, ambient air quality is determined by sampling and analyzing the atmosphere over a large geographic area, or "air shed," to determine the average amount of pollutants existing therein. The latter measurements of necessity include all pollutants in the air, natural as well as man-made, from all sources, not only from the sources emitting within the geographic area, but from those outside as well, whose pollutants may infuse the sample. Thus, a measure of the quality of ambient air does not generally reveal the identity of any specific emitter, the amount which that emitter contributes, or even the period over which the specific emissions have occurred.

■ It therefore makes a great deal of sense to use ambient air quality standards only as goals to determine when, and the extent to which, specific emission control standards should be adopted or modified. But it is illogical to condition the continued existence of each individual emittee's permit on the fact that *he* not exceed the ambient air quality standard, since no single source ever has sole control of the quality of ambient air.

■ Appellees claim that the authority to impose ambient air quality standards by way of permit criteria exists in the language of § 25–7–112(4)(d) which specifies that a permit be granted unless the project "would not meet applicable emission standards, or regulations of the Commission." In appellees' interpretation, the word emission relates only to the word "standards," and not to the word "regulation," thus allowing the Commission to regulate with reference to ambient air standards. We do not believe the quoted language reconciles the inherent distinction between ambient air quality standards on the one hand and quantity and nature of emissions on the other. We read the word "emissions" as

applying to both standards and regulations, but as excluding ambient air quality standards since these are dealt with specifically in the next sentence.

▮▮ We believe the Commission's initial authority, and responsibility, relative to ambient air quality standards is limited, by the Act, to the establishment of such standards or goals. In order to insure that the Commission should have the power and authority to insure that these goals were attained, the General Assembly, under our interpretation of the Act, adopted a legislative scheme based upon promulgation, modification and enforcement of specific emission control regulations, as distinguished from one which would purport to make all emitters generally responsible for broad overall air quality standards as a condition of retaining their permits. The flexibility to meet specific and changing conditions and the specific accountability inherent in using the emission control method of attaining ambient air quality standards, merely strengthens our view that the General Assembly intended to avoid the problems previously referred to. In the Act, ambient air quality standards, or goals and emission control regulations are treated in separate sections. *See* § 25–7–108 and § 25–7–109, C.R.S.1973 (1980 Cum.Supp.).

▮▮ Moreover, the enforcement section of the Act, § 25–7–115, C.R.S.1973 (1980 Cum.Supp.), only authorizes the division to enforce emission control regulations promulgated pursuant to § 25–7–109, and not ambient air standards adopted pursuant to § 25–7–108. Adoption, modification, and enforcement of Emission Control Regulations are tools used to achieve an acceptable level of ambient air quality, that is, to attain the established ambient air quality standards. The trial court recognized this problem when it said:

"[E]ven accepting the underlying premise of the argument concerning the difficulty of relating violations of ambient air standards to a particular source, the hard fact remains that the level of pollutants in the air shed can most effectively be controlled by regulation of point-source emissions through the emission permit process."

For this reason, the Division was authorized by the General Assembly to seek injunctions or civil penalties only for violations of cease and desist orders based upon noncompliance with emission control regulations, not for lack of achievement of ambient air quality standards. *See* § 25–7–121 and 122, C.R.S.1973 (1980 Cum.Supp.).

This interpretation is buttressed by the fact that the due process guarantees provided for in the variance and hearing procedures established by the Act relate only to emission control regulations, and not to ambient air quality standards. *See* § 25–7–117, 118 and 119, C.R.S.1973 (1980 Cum. Supp.). Accordingly, we reject the appellees' interpretation of § 25–7–112(4)(d).

Having determined that the conditions relative to compliance with ambient air quality standards imposed upon Colorado-Ute resulted from action by the Commission in excess of the authority granted to it, we declare such conditions invalid.

The judgment is reversed and the cause is remanded to the trial court with directions to enter judgment in accordance with the views expressed herein.

VAN CISE, J., concurs.

BERMAN, J., dissents.

BERMAN, Judge, dissenting.

I respectfully dissent.

A presumption of regularity attaches to an administration's regulation when it is acting within its statutory power and within the parameters of its organic legislation as here. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). A reviewing court may reverse an administrative ruling only when there is no rational basis to the agency's decision and it is not "reasonably related to a legitimate use of state authority." *Peshel v. Motor Vehicle Division*, 43 Colo.App. 58, 602 P.2d 875 (1979); *see Overton Park, supra*. This is not the case here.

Here, the enabling statute explicitly authorizes the Commission to set emission standards and ambient air standards and to issue permits based on these standards. Section 25–7–101 et seq., C.R.S.1973. Section 25–7–112(4)(d), C.R.S.1973 is the pertinent section here. It sets up a two-pronged test for the issuance of permits which incorporates both the emission standards and the ambient air standards. It states: "The division [of administration of the department of health] shall grant the permit unless it determines that the proposed project or activity would not meet applicable emission standards or regulations of the Commission or would interfere with the attainment or maintenance of the then existing federal primary or secondary ambient air standards." In reaching its conclusion the majority ignores the second and equally important element of using the ambient air standard in its issuance of a permit.

Section 25–7–112(4)(d) goes on to state: "Any permit issued by the division may contain such terms and conditions as it deems necessary for the proposed project or activity to qualify for a permit." In this instance the Commission was acting well within its legislative mandate when it attached the condition pertaining to the ambient air standards. *See Air Pollution Control Commission v. District Court*, 193 Colo. 146, 563 P.2d 351 (1977).

Section 25–7–106, C.R.S.1973, directs that: "[T]he commission shall have *maximum flexibility* in developing an effective air pollution control program and may promulgate such combination of regulations as may be necessary or desirable to carry out the legislative purpose set forth in § 25–7–102." (emphasis added) Integral to the development of that program is the development and attainment of ambient air standards, § 25–7–108, C.R.S.1973, to ensure the goals of the statute, which include the "achieve[ment of] the maximum practical degree of air purity in every portion of the state, [and], [t]o that end, it is the purpose of this article to require the use of all available practical methods to reduce, prevent, and control air pollution throughout the entire State of Colorado." One of the practical means available to the Commission is the attaching of conditions to permits.

When addressing the constitutionality of the Air Pollution Control Act, the Supreme Court specifically acknowledged the complexity of the program, the wide discretion placed in the Commission, and the fact that precise standards in this area are impossible to administer. *Lloyd A. Fry Roofing Co. v. Department of Health*, 179 Colo. 223, 499 P.2d 1176 (1972); *see also Colorado River Water Conservation District v. Colorado Water Conservation Board*, 197 Colo. 469, 594 P.2d 570 (1979). In essence, measurement of the exact quality of the ambient air and the exact extent to which a certain pollutant contributed may not be precise, but it is ascertainable. *See Lloyd A. Fry Roofing Co., supra; Air Pollution v. Western Alfalfa Corp.*, 191 Colo. 455, 553 P.2d 811 (1976).

Moreover, the majority's reliance on the legislative history is misplaced. The testimony so voluminously cited to in the record is testimony which was before the Commission when it was in the process of promulgating the regulations and, as such, is only indicative of the basis of those regulations, but it cannot be retroactively imposed as evidence of the intentions of the General Assembly in framing the legislation. *See Aparacor, Inc. v. United States*, 571 F.2d 552, 215 Ct.Cl. 596 (1978); *Friedman v. United States*, 364 F.Supp. 484 (D.Ga.1973).

Further, in my view, the detailed analysis of the trial court's exhaustive opinion correctly disposes of each of appellants' arguments. I would affirm it in its entirety.