**Taylor HAWES and Colorado Health Care Conversions Project, Petitioners,**

**and**

**Kelly, Haglund, Garnsey, & Kahn LLC; and Colorado Center On Law & Policy, Attorney–Petitioners,**

**v.**

**COLORADO DIVISION OF INSURANCE, William J. Kirven III, in his capacity as Commissioner of Insurance; Rocky Mountain Hospital and Medical Service, Inc., d/b/a Anthem Blue Cross Blue Shield of Colorado, a Colorado insurance corporation, a continuation of Rocky Mountain Hospital and Medical Service, d/b/a Blue Cross Blue Shield of Colorado, a Colorado nonprofit hospital,**

medical-surgical health service corporation; Anthem Insurance Companies, Inc., an Indiana mutual insurance company; Anthem West, Inc., an Indiana stock insurance company; and Caring for Colorado Foundation, Respondents.

No. 01SC743.

Supreme Court of Colorado, En Banc.

March 3, 2003.

Rehearing Denied April 7, 2003.

Jean E. Dubofsky, P.C., Jean E. Dubofsky, Boulder, Colorado, Attorney for Attorney–Petitioners Kelly, Haglund, Garnsey, & Kahn, LLC.

Kelly, Haglund, Garnsey, & Kahn LLC, Edwin S. Kahn, Christine L. Murphy, Denver, Colorado, Attorneys for Petitioner Taylor Hawes.

Colorado Center on Law & Policy, Elisabeth D. Arenales, Denver, Colorado, Attorneys for Petitioner Colorado Health Care Conversions Project and for Itself as Attorney–Petitioner.

Ken Salazar, Attorney General, James F. Carr, Senior Assistant Attorney General, Business and Licensing Section, Denver, Colorado, Attorneys for Respondent Colorado Division of Insurance and William J. Kirven, III, Commissioner of Insurance.

Cantilo & Bennnett, LLP, Patrick Cantilo, Austin, Texas, Also Attorney for Respondent Colorado Division of Insurance and William J. Kirven III, Commissioner of Insurance.

Baker & Hostetler LLP, Mark D. Flink, Alfred C. Chidister, Denver, Colorado, Attorneys for Respondent Caring for Colorado Foundation.

Sherman & Howard LLC, Frederick Y. Yu, Writer Mott, Denver, Colorado, Attorneys for Respondents Rocky Mountain Hospital & Medical Service, Inc., d/b/a Anthem Blue Cross Blue Shield of Colorado, a continuation of Rocky Mountain Hospital and Medical Service, d/b/a Blue Cross Blue Shield of Colorado, Anthem Insurance Companies, Inc., and Anthem West, Inc.

Isaacson, Rosenbaum, Woods & Levy PC, Edward T. Ramey, Denver, Colorado, Attorneys for Amicus Curiae Colorado Lawyers Committee.

Justice MARTINEZ delivered the Opinion of the Court.

Today we decide whether the Commissioner of Insurance has incidental and implied authority to award attorneys' fees from a

common fund when presiding over a quasi-adjudicatory, equitable conversion proceeding if the attorneys' representation of the public interest was necessary to the Commissioner's performance of his express statutory duties, and if no legislation prohibits such an award. Resolution of this issue requires that we analyze whether the Division of Insurance and the Commissioner have implied powers within their enabling acts and within the conversion statute to award attorneys' fees.

■ We proceed in our analysis as follows. First, we show that the common fund doctrine is a common law equitable remedy available in courts of general jurisdiction and recognized by Colorado courts. Second, we highlight the jurisdiction of the Division of Insurance and its Commissioner, including express powers from which the implied and incidental authority to do equity may emanate. Third, we explain that the General Assembly did not abrogate the common law right to common fund fees in either the enabling statutes or by reposing in the Commissioner exclusive jurisdiction to preside over the conversion proceeding. Finally, we conclude with our holding: in its broad statutory grant of power to the Division of Insurance and its Commissioner, the General Assembly has delegated incidental and implied powers to the Commissioner to award attorneys' fees under the common fund doctrine where it is necessary for the Commissioner to discharge his responsibilities in an equitable conversion proceeding and if nothing prohibits such an award. However, the Division is without jurisdiction to reach an award of attorneys' fees for lobbying efforts conducted prior to the establishment of the Commissioner's authority to preside over a conversion proceeding. Our decision today is not a broad declaration that a state agency has available to it all powers of a court to do equity; nor does it expand the jurisdiction of the Commissioner or the Division into the equitable arena. Thus, our holding is a narrow one, limited to well-established implicit powers of an administrative agency to do all that is necessary to effectuate its express mandate.

## I. Facts & Procedure

In this sui generis case, we assume a common fund arose from petitioners' role in the conversion of Rocky Mountain Hospital & Medical Service, d/b/a Blue Cross Blue Shield of Colorado, from a nonprofit to a for-profit corporation pursuant to section 10–16–324, 3 C.R.S. (2002) (conversion statute). The conversion proceeding is an equitable one, and is the legislative equivalent of the cy pres doctrine: the assets of the nonprofit insurance provider are transferred to accomplish a charitable intent as near as possible to the original intent.

Petitioner-attorneys and petitioners (together "petitioners") consisted of two separate groups who intervened in the conversion proceeding. One set of intervenors represented two Blue Cross subscribers, first Jess McGee and later Taylor Hawes; another set represented Colorado Health Care Conversions Project, a community-based coalition of thirty organizations.

Upon conversion, $155 million, the fair market value of Blue Cross was transferred to the Caring for Colorado Foundation, a private charitable corporation created specifically for the conversion. According to petitioners, they enhanced the fair market value the Foundation received by $55 million, and that portion constitutes the common fund from which they seek fees and costs.

■ We assume, without deciding, for purposes of this appeal, that petitioners' zealous advocacy enhanced both the pecuniary and nonpecuniary aspects of the conversion. Had the conversion taken place in a court, petitioners would have a classic common law claim for attorneys' fees under the common fund doctrine. Additionally, courts, in their inherent equity jurisdiction, may award common fund attorneys' fees for advocacy in administrative proceedings. Moreover, the parties do not dispute that the conversion statute, granting the Commissioner exclusive jurisdiction over the conversion, and precluding litigation in a court of general jurisdiction, did not abrogate the common law right of petitioners to fees under the common fund doctrine. Nor do they dispute the absence of legislation prohibiting any award of attorneys' fees. Therefore, what remains for us

to determine is whether the Commissioner of Insurance has the authority to grant attorneys' fees under the equitable common fund doctrine.

## A. The Blue Cross Conversion

In January 1997, Blue Cross filed with the Division of Insurance its Plan of Conversion to a Stock Insurance Company required by the conversion statute. During the conversion, the Commissioner determined the structure of the qualifying entity and the fair market value of the converting corporation. Then, the deal between Blue Cross and Anthem West was consummated upon Anthem's acquisition of the shares of Blue Cross, pursuant to the exchange statute, section 10–3–601, 3 C.R.S. (2002), which is not at issue here.

Petitioners claim that their advocacy enhanced the value of the charitable trust that passed to the Foundation. In their list of accomplishments, which we recite only in part, they state that during the drafting of the conversion statute, section 10–16–324, their lobbying efforts influenced the legislature's formulation of consideration paid from the converting corporation to the charitable qualifying entity receiving the funds of conversion. Moreover, counsel allege they were instrumental in the establishment of the governance and structure of the qualifying entity: whether it was a private or public one, and the determination of the selection of advisory board members. Finally, counsel state that their efforts ensured that the converting corporation, rather than the qualifying entity, paid for the conversion, and that the consideration paid to the entity was in cash, not stock. The extent to which petitioners enhanced the consideration, however, is in dispute, because it was not addressed after the Commissioner's decision that he lacked authority to award attorneys' fees. For their efforts, petitioners requested $2.75 million in attorneys' fees, $16,363.07 for out-of-pocket expenses, and $62,043.50 for expert witness fees.

Petitioners were not alone in representing the public interest in the conversion proceedings. A Testimonial Staff, created pursuant to the conversion statute, also advanced the public interest, though its advice to the Commissioner was at times contrary to that of petitioners. The Testimonial Staff's fees were paid by the converting corporation, as required by the conversion statute. § 10–16–324(5).

## B. Commissioner's Decision and Subsequent Appeal

Upon conclusion of the conversion and exchange, the petitioners requested attorneys' fees. The Commissioner stated that his position has neither statutory grant, equitable powers existing apart from any legislative grant, nor legislative power similar to that of the Public Utilities Commission (PUC) to award fees.

Petitioners appealed the Commissioner's decision to the court of appeals, which affirmed. The court of appeals agreed that the Commissioner has neither express nor implied statutory authority to award fees. Specifically, the court of appeals explained that section 10–1–101, 3 C.R.S. (2002) does not empower the Commissioner to do equity. Although that provision states that all persons having to do with insurance services must practice equity, it is a legislative policy, and cannot be read as a grant of authority to the Commissioner to award attorneys' fees:

> Such policy requires that all persons having to do with insurance services to the public be at all times actuated by good faith in everything pertaining thereto, abstain from deceptive or misleading practices, and keep, observe, and practice the principles of law and equity in all matters pertaining to such business.

*Hawes v. Colorado Div. of Insurance,* 45 P.3d 763, 767 (Colo.App.2001) (citing section 10–1–101). The court of appeals further held that although the Commissioner has statutory powers equitable in nature, he does not thereby have equitable authority apart from the statutory scheme. *Id.; see* § 10–1–111(4), 3 C.R.S. (2002) (grants Commissioner authority to issue a cease and desist order where grounds for suspension or revocation of license are satisfied); § 10–3–1108 (grants Commissioner power to order certain persons found to have engaged in unfair competition or deceptive practices to cease and

desist from such acts); § 10–2–911 (Commissioner can order restitution to victims of reinsurance violations). Furthermore, the court of appeals held that assuming the conversion statute proceedings are equitable in nature, the Commissioner has no implied equitable powers to award petitioners fees because the petitioners' role was not reasonably necessary for the Commissioner to effectuate the conversion: the Testimonial Staff sufficiently represented the same public interest. *Id.* at 768. Finally, the court of appeals found unconvincing Petitioners' arguments that the authority of the Commissioner of Insurance is fully analogous to the PUC to award attorneys' fees. *Id.*

## II. Standard of Review

 Section 10–16–324(15) authorizes judicial review of any final action of the Commissioner as to the conversion, and section 24–4–106(7), 7B C.R.S. (2002), of Colorado's Administrative Procedure Act defines the standards for judicial review. In general, a court must defer to agency discretion in its findings. However, an agency's determination of its own jurisdiction is subject to de novo review by a court. § 24–4–106(7); *Colorado–Ute Electric Ass'n, Inc. v. Air Pollution Control Comm'n of Colorado Dep't of Health,* 648 P.2d 150, 153 (Colo.App.1981) (province of court to determine extent of administrative agency enabling legislation) (citing *Social Security Bd. v. Nierotko,* 327 U.S. 358, 369, 66 S.Ct. 637, 90 L.Ed. 718 (1946) (administrative agency cannot finally decide the limits of its statutory authority because that is a judicial function); *J.B. Montgomery, Inc. v. United States,* 206 F.Supp. 455, 458 (D.Colo.1962) (same)); Cass R. Sunstein, *After the Rights Revolution* 224 (1990) ("A cardinal principle of American constitutionalism is that those who are limited by law should not be empowered to decide on the meaning of the limitation: foxes should not guard henhouses."). Therefore, we review de novo the Commissioner's refusal to award attorneys' fees under the common fund doctrine.

 At the outset, we agree with the court of appeals that there must be a legislative authorization for an administrative agency's grant of attorneys' fees, even an equitable, fee-sharing, common fund consisting of the enhanced value of the charitable trust. Furthermore, we agree that the Division of Insurance and its Commissioner do not wield the powers accorded to the PUC by the General Assembly. We leave for another case an interpretation of section 10–1–101, as it is unimportant here.

## III. The Common Fund Doctrine in Courts of General Jurisdiction

 Colorado requires that in the absence of an express statute, court rule, or private contract to the contrary, attorneys' fees cannot be recovered. *Allstate Ins. Co. v. Huizar,* 52 P.3d 816, 818 (Colo.2002) (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Bernhard v. Farmers Ins. Exch.,* 915 P.2d 1285, 1287 (Colo.1996)). One exception to this principle, termed the "American rule," is the common fund doctrine. The common fund doctrine is an equitable remedy that affords fees to attorneys for their advocacy for the benefit of others. It is grounded in equitable principles of quantum meruit and unjust enrichment. *Kuhn v. State,* 924 P.2d 1053, 1059 (Colo. 1996). The common fund doctrine springs from a court's power to do equity and has its origins in fiduciary law, where a trustee acting to create or preserve assets of a trust is entitled to reimbursement from the trust. *Id.* at 1058 (citing *Trustees v. Greenough,* 105 U.S. 527, 26 L.Ed. 1157 (1881)).

Colorado recognizes the common fund doctrine. *Kuhn,* 924 P.2d 1053. In *Kuhn,* attorneys sought fees from a fund of tax refunds, illegally collected from military retirees. *Id.* at 1055. The attorneys instituted a class action to overturn an unconstitutional state income taxation scheme. *Id.* At the conclusion of litigation, class counsel requested 25% of the refunds to be issued to their clients. *Id.*

 We stated that the common fund doctrine is unlike statutory fees, which result in the *shifting* of the fee burden to the losing party; rather common fund fees result in a *sharing* of the fees among those benefited by the litigation. *Id.* at 1057–58. Therefore, a

court needs no legislative support to award fees under the common fund doctrine. Thus, had the conversion proceeded in Colorado's courts of general jurisdiction, attorneys' fees under the common fund doctrine would have been available.

Courts have also granted common fund attorneys' fees for advocacy before an administrative agency. *See Honda v. Mitchell*, 419 F.2d 324 (D.C.Cir.1969) (court in its equitable jurisdiction could award attorneys' fees for work in administrative proceedings establishing the conversion rate for yen seized as alien property by the United States); *Powell v. Pennsylvania RailRoad Co.*, 267 F.2d 241 (3d. Cir.1959) (attorneys' fees from common fund for administrative proceedings before National Adjustment Board); *Paris v. Metropolitan Life Ins. Co.*, 94 F.Supp. 792 (S.D.N.Y.1947) (court in its equity jurisdiction awarded fees for advocacy before National War Labor Board); *Young v. Mory*, 294 Ill.App.3d 839, 228 Ill.Dec. 965, 690 N.E.2d 1040 (1998) (court in its equity jurisdiction awarded common fund fees for work before Illinois Industrial Commission in a workers' compensation dispute); *Kerr v. Killian*, 197 Ariz. 213, 3 P.3d 1133 (Ariz.Ct.App. 2000) (in tax refund case, prevailing party in administrative proceeding entitled to funds under common fund doctrine).

As the above cases indicate, courts have in their equitable powers granted fees for advocacy before an administrative agency. Yet, state agencies also award attorneys' fees from a common fund where they have implied and incidental powers, as further explained below.

## IV. Jurisdiction of the Division of Insurance and Its Commissioner

 The constitutional doctrine of separation of powers mandates that agencies act only within the scope of their delegated authority. Although the Colorado Constitution Art. IV, § 23 establishes the position of the Commissioner of Insurance, the General Assembly empowers the Division of Insurance and the Commissioner to perform duties specified in the voluminous Title 10 of our legislative code. As such, the Division and the Commissioner have no general, in-

herent, or common-law powers, but only those powers expressly conferred by the legislature. *Flavell v. Dep't of Welfare*, 144 Colo. 203, 355 P.2d 941 (1960); Lars Noah, *Interpreting Agency Enabling Acts: Misplaced Metaphors in Administrative Law*, 41 Wm. & Mary L.Rev. 1463 (2000) ("As creatures of statutes lacking any independent constitutional pedigree, agencies cannot invoke some kind of inherent authority to justify actions that find no warrant in their enabling legislation.") (in reference to federal agencies, but equally applicable here to the Division of Insurance, a state agency).

 Both the Division of Insurance and its Commissioner derive authority from enabling legislation including sections 10–1–103, 10–1–108, and from Colorado's Administrative Procedure Act, section 24–1–101, *et seq.* That is not to say, however, that the legislature must detail the Commissioner's jurisdiction in the legislative code because the General Assembly cannot delegate explicitly for every contingency that may arise. Not surprisingly, therefore, it is also well-established that agencies possess implied and incidental powers filling the interstices between express powers to effectuate their mandates. *Colorado State Bd. of Land Comm'rs v. Colorado Mined Land Reclamation Bd.*, 809 P.2d 974, 983 (Colo.1991). Thus, the lawful delegation of power to an administrative agency carries with it the authority to do whatever is reasonable to fulfill its duties.

The following delineates the sources of authority, including express, implied and incidental powers, possessed by administrative agencies generally, and the Commissioner of Insurance, in particular.

### A. Express Authority

There is no lack of legislative mandates to Colorado state agencies to provide attorneys' fees. For illustrative purposes, we list some express delegations to a state agency to provide attorneys' fees and costs for a prevailing party. Most examples are in the context of fee-shifting, a statutory exception to the American Rule under which parties pay for their own costs and attorneys' fees. *See*

§ 24–50–125.5, 7B C.R.S. (2002) (in the state personnel system, an action brought frivolously, in bad faith, maliciously, or as a means of harassment or otherwise groundless, shall result in attorneys' fees and costs against offending party and determination is to be made by the agency); § 24–109–104, 7B C.R.S. (2002) (under state Procurement Code and for purposes of bidding for a state contract, where protesting bidder or offeror should have been awarded contract under solicitation but, due to defect in solicitation, was not, protestor shall be entitled to the reasonable costs, but not attorneys' fees, incurred in connection with the solicitation; and determination shall be made by the executive director); § 34–33–124(5), 9 C.R.S. (2002) (under Colorado Surface Coal Mining Reclamation Act, whenever order issued under this section or as a result of any administrative proceeding under this article, all costs and expenses, including attorneys' fees which board determines to have been reasonably incurred may be assessed against any party to the proceedings, as the board deems just and proper); § 34–60–118.5(6), 9 C.R.S. (2002) (pursuant to Oil and Gas Conservation Act, the commission may assign to parties costs of any administrative proceeding and may award reasonable attorneys' fees and costs to the prevailing party); § 40–3.5–104(4), 11 C.R.S. (2002) (for regulation of rates and charges by municipal authority, where complaint heard by commission is deemed not frivolous, all reasonable costs as determined by the commission, including reasonable attorneys' fees, shall be paid by utility).

Indeed, even the Commissioner of Insurance has express authority to compensate attorneys under the conversion proceedings. Section 10–16–324(5) states that the Commissioner of Insurance may employ experts, such as attorneys, whose fees are to be borne by the converting corporation:

> The commissioner may retain, upon notice to the corporation, any qualified experts, such as attorneys, accountants, actuaries, and financial analysts, not otherwise a part of the commissioner's staff, to assist in reviewing the proposed plan, with such reasonable expenses incurred during the review to be borne by the corporation.

Therefore, the General Assembly has clearly stated when it delegates authority to an agency to grant attorneys' fees. However, that the delegated authority is express does not compel the conclusion that the absence of such a provision precludes an agency from granting attorneys' fees where authority can be implied, particularly where a denial of fees would constitute an abrogation of common law rights and where the General Assembly has enacted no legislation otherwise prohibiting an award of fees.

## B. Implied and Incidental Authority to Award Common Fund Attorneys' Fees

Certainly, no implied powers exist when an agency exceeds its jurisdiction by acting contrary to the Colorado Constitution, *Telluride Reg'l Airport Auth. v. Bd. of Equalization,* 789 P.2d 201 (Colo.App.1989); contrary to express statutory provisions, *Bd. of Med. Exam'rs v. Duhon,* 895 P.2d 143 (Colo.1995); when such authority would be in derogation to statutory purpose, *State Farm Mutual Automobile Ins. Co. v. Barnes,* 41 Colo.App. 380, 585 P.2d 929 (1978); or when it does something entirely unrelated to its statutory purpose, *Bd. of Barber Exam'rs v. White,* 29 Colo.App. 471, 485 P.2d 928 (1971). That said, administrative agencies do not exceed their jurisdiction when they exercise their implied authority to do all which is reasonably necessary to effectuate express duties.

"Necessary" to discharge duties delegated by the legislature is a determination decided on a case-by-case basis. Therefore, we state that whether a power to be exercised by an agency is a reasonably necessary one cannot be something that is a matter of law. Rather, it is a mixed question of law and fact.

To determine what is "necessary," we first look to the nature of the administrative proceeding: including whether private or public interests are at stake; whether remedies sought are those traditionally at law or in equity; and whether it is a quasi-legislative or quasi-adjudicatory proceeding. Sec-

ond, we evaluate whether the circumstances, in relation to the type of proceeding, require the agency to exercise its implied and incidental powers. Such a methodology is required because more than one avenue can be used to achieve similar results. Finally, we note that the legislature need not recite the talismanic phrase "do all things ... which are necessary and convenient" for an agency to invoke its implied and incidental powers.

The following discussion details two concepts. First, we show where courts have found an administrative agency's award of common fund attorneys' fees necessary, mainly in the context of the Public Utilities Commission (PUC). Second, we demonstrate what courts have delineated as "necessary." Although the PUC is generally not comparable in scope and authority to the Division of Insurance, we explore PUC cases for illustrative purposes.

Importantly, nothing in Colorado's Public Utilities Law, section 40–1–101, *et seq.* expressly states that the PUC is authorized to award common fund attorneys' fees to a party who successfully challenges a public utility's action and thereby renders a service on behalf of general consumer interests. However, we have found the commission has authority to award common fund fees from a refund to taxpayers. *Mountain States Telephone and Telegraph Co. v. Public Utilities Comm.*, 180 Colo. 74, 502 P.2d 945 (1972) (*Mountain States I*). In *Mountain States I*, Mountain Bell sought an increase in utility rates. *Id.* at 946. The Colorado Municipal League and the City and County of Denver intervened and opposed the increase in rates, and the commission ordered Mountain Bell to refund the amount of overcharge to the ratepaying customers. *Id.* at 948. The League sought attorneys' fees from the refund, and we held that the Commission had jurisdiction to award attorneys' fees and expenses to the League. We cited a PUC dissent that stated that without the "aggressive" action of the intervenors, higher rates may have been established and the refund lost, *id.* at 952, and thus the League's participation was necessary to bring about the refund for consumers. We left to the commission to determine

whether an award of fees and costs would be equitable. *Id.*

In a later case, *Mountain States II*, we clarified that the refund itself did not authorize the PUC to make the award of attorneys' fees; the presence of the common fund was only an incidental consideration as to whether the commission had jurisdiction to award fees. *Mountain States Telephone and Telegraphic Co. v. Public Utilities Comm.*, 195 Colo. 130, 135, 576 P.2d 544, 547 (1978) (*Mountain States II*). Rather, the authority already existed in the agency's implied and legislative powers to award fees. The PUC's authority to grant fees emanated from Art. XXV of the Colorado Constitution which delegates to the PUC the legislative authority to regulate rates to be charged by public utilities. *Id.*

Authority also arose from a statutory mandate in section 40–3–102 to "do all things which ... are necessary and convenient in the exercise" of its power to regulate utility rates. *Id.* at 547. Therefore, under section 40–3–102, the PUC has legislative and implied authority to promulgate rules to effect a fee-shift for attorneys' fees or to award common fund fees. *Id.*

Because the legislature had not by any statutory enactment restricted the PUC in the matter of awarding attorneys' fees, and because the legislature delegated to the PUC the broad based authority to do whatever it deems necessary or convenient to accomplish the legislative functions delegated to it, the PUC had the authority to grant attorneys' fees to an intervenor. *Id.*

*See also Northern Indiana Public Service Co. v. Citizens Action Coalition of Indiana, Inc.*, 548 N.E.2d 153 (Ind.1989) (although commission lacks equitable powers of a court of law, its task is essentially an equitable one in balancing the relationship between utilities and its consumers, and therefore, to remedy an unjust or unreasonable practice, attorneys' fees may be warranted under the common fund doctrine); *Consumers Lobby Against Monopolies v. Public Utilities Comm.*, 25 Cal.3d 891, 160 Cal.Rptr. 124, 603 P.2d 41 (1979) (although administrative agency's powers do not coincide with that of a court's, agency has implied powers "cognate

and germane" to the regulation of public utilities, and PUC has jurisdiction to award common fund attorneys' fees in reparations case).

Awarding attorneys' fees is an extraordinary remedy and these PUC cases in Colorado and in our sister states, have granted equitable common fund attorneys' fees under narrow holdings. These cases recognized that the commission has a broad authority to effectuate its powers; that the commission had implied equitable authority to carry out its express mandate; that intervenors were necessary in representing the general public interest; that as a result of the intervenors' efforts, a common fund resulted; and no legislation either abrogated the common law right or otherwise prohibited a grant of fees.

The following sections discuss the source of implied and incidental powers of the Commissioner of Insurance, in the enabling acts and in the conversion statute, and devolve to the question at hand: whether the Commissioner of Insurance also has authority to award attorneys' fees from a common fund.

## V. The Enabling and Conversion Statutes

### A. Enabling Statutes

 The Commissioner of Insurance has broad statutory powers conferred upon it by the legislature to perform the Division's functions and duties. *Hartford Fire Ins. Co. v. Colorado Div. of Insurance,* 824 P.2d 76 (Colo.App.1991) (holding that sections 10–1–101 and 10–1–108 empower the Commissioner of Insurance to determine whether a provider has acted in bad faith). These duties, outlined in title 10, are accomplished in a manner consistent with the legislative declaration in section 10–1–101 to promote the public welfare and to maintain the principles of law and equity in all matters pertaining to the business of insurance.

Section 10–1–103 is the enabling statute that establishes the Division of Insurance. It charges the Division with the execution of

laws relating to insurance, giving it a supervising authority over the business of insurance in this state.[1] Section 10–1–108 lists the duties of the Commissioner in relation to reports, publications, fees, disposition of funds, and adoption of rules. The concluding sentence of section 10–1–108(1) charges the Commissioner to generally "do and perform with justice and impartiality all such duties as are or may be imposed on him by the laws in relation to the business of insurance in this state." Subsection (8) states that it is the "duty and responsibility of the Commissioner to supervise the business of insurance in this state to assure that it is conducted in accordance with the laws of this state and in such a manner as to protect policyholders and the general public." Section 10–1–109 also provides the Commissioner authority to "establish reasonable rules and regulations as are necessary to enable the Commissioner to carry out [his] duties under the laws of the state of Colorado."

 The Commissioner additionally has the express authority to perform the conversion of a health insurance provider from nonprofit status to a for-profit corporation. In light of the legislature's delegation of broad authority to the Commissioner to regulate the business of insurance in a just and reasonable manner, the Commissioner must be cognizant that the conversion also be carried out in a manner that is just and reasonable.

### B. Conversion Statute

In enacting the conversion statute, the General Assembly intended to provide Colorado's nonprofit health care insurers a method of conversion in response to the changing market conditions.

> [The General Assembly] recognizes the substantial and recent changes in market and health care conditions that are affecting such [nonprofit] corporations and further recognizes the need for equal regulatory treatment and competitive equality for health care insurers. The General As-

---

1. Section 10–1–103 automatically sunsets July 1, 2002. § 10–1–103(6)(b). However, under section 24–34–104(5)(b), the Division of Insurance continues to operate to wind up affairs for a period of one year. The reestablishment of the Division

of Insurance has been passed by the General Assembly in SB–59 and is currently awaiting the Governor's signature. Nonetheless, this article was in effect during the conversion proceeding.

sembly further finds that a procedure for conversion to a stock insurance company will be in the best interests of policyholders by providing greater financial stability for such company's policyholders and a greater opportunity to remain a financially independent Colorado company. § 10–16–324(1). The conversion statute was enacted in response to Blue Cross' desire to become for-profit to assure its continued viability. Comments of Representative Owen, Hearing on S.B. 96–100 Before the House Committee on Health, Environment, Welfare and Institutions, 60th General Assembly, Second Reg. Sess. (Mar. 13, 1996). The conversion statute intended to preserve a charitable trust for the citizens of Colorado and the Colorado taxpayers who had provided decades of tax subsidies to the converting corporation. Comments of Commissioner Ehnes, Division of Insurance, Hearing on S.B. 96–100 Before the House Committee on Health, Environment, Welfare and Institutions, 60th General Assembly, Second Reg. Sess. (Mar. 13, 1996) ("The issue here is making sure that a company, an insurance company that wants to convert, that wants to be viable, independent company, also repays its debt to the public.").

 Therefore, the conversion statute requires that a converting nonprofit transfer its value to other nonprofits. It is the legislative equivalent to the equitable doctrine of cy pres. Thus, the Commissioner presided over a quintessentially equitable proceeding.

The conversion statute requires the converting nonprofit corporation submit a Plan for Conversion to the Commission of Insurance. That Plan must be adopted by the majority of the board of directors of the corporation. § 10–16–324(4)(a). It must establish that the proposed conversion will not be prejudicial to the subscribers of the corporation or to the citizens of Colorado. § 10–16–324(4)(b). Additionally, it must provide a comparative premium rate analysis of the corporation's major plans and product offerings and provide for the protection of all existing contractual rights of the corporation's subscribers or contract holders. § 10–16–324(4)(c)–(d). Finally, the Commissioner must approve of the Plan by specifying a

reasonable treatment of the value of the corporation for the benefit of the citizens of Colorado. § 10–16–324(4)(e).

In specifying a reasonable treatment of the converting corporation's assets, the Commissioner engages in a series of decisions. First, he ensures that the consideration to a "qualifying entity," here the Caring for Colorado Foundation, equals the fair market value of the converting corporation. § 10–16–324(e)(I)(A)–(C). Second, the Commissioner determines whether the consideration after transfer to the qualifying entity remains protected. § 10–16–324(e)(I)(D) (prohibiting dilution of stocks after transfer to qualifying entity)—§ 10–16–324(e)(I)(E) (maintaining independence of the qualifying entity and the corporation). Third, the Commissioner reviews whether the mission of the qualifying entity is charitable and dedicated to promoting or serving the health care needs of the citizens of Colorado. § 10–16–324(e)(I)(F) and § 10–16–324(e)(II)(A) (qualifying entity shall be organized under section 501(c)(3) or 501(c)(4) of the federal "Internal Revenue Code of 1986").

After the Plan is submitted and notice is published, the Commissioner must hold a hearing pursuant to Colorado's Administrative Procedure Act before making a final decision approving or disapproving the Plan. § 10–16–324(6)–(7). The legislature could not include every detail of the conversion, but the Commissioner was to determine how to effectuate the intent of the legislature: to balance the interests of the converting corporation and assure a fair and equitable treatment of the funds transferred to the qualifying entity.

In the conversion proceeding, many issues raised and addressed were not specified by the legislature, and thus the Commissioner made intermediate decisions. For example, the Commissioner requested the parties to brief whether the Foundation or Blue Cross would bear the costs of conversion: a pristine example of the Division's implied and incidental power to effectively perform the conversion. We show next that the Commissioner also had implied and incidental authority to award common fund attorneys' fees.

## VI. The Conversion Statute Does Not Abrogate the Common Law Right to Attorneys' Fees

### A. Common Law Right to Attorneys' Fees from Enhanced Charitable Trust

We have already discussed that Colorado recognizes the common fund doctrine. Relying on the seminal common fund case of the United State Supreme Court, we state that the common fund doctrine is especially appropriate in the context of charitable trusts. *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1881); *see also* John P. Dawson, *Lawyers and Involuntary Clients: Attorney Fees from Funds*, 87 Harv. L.Rev. 1597 (1974). Finding for attorneys' fees from the common fund, the Supreme Court in *Greenough* stated "[i]t is a general principle that a trust estate must bear the expenses of its administration." *Greenough*, 105 U.S. at 532. The court based its ruling on common law cases in which charitable funds, enhanced by the advocacy of counsel, also provided a basis for attorneys' fees. *Id.* at 533 (citing *Attorney–General v. The Brewers' Company* (1 P.W. 376) (Lord Chancellor Cowper allowed costs to relators out of improved rents which they received for charity); *Attorney–General v. Kerr* (4 Beav. 297) (relator in a charity information entitled to fees)). Therefore, since petitioners allege they have enhanced the value of a charitable trust, it is evident that they may have a common law right to attorneys' fees from the enhanced value of that trust.

### B. No Legislative Abrogation of the Common Law Right to Common Fund Attorneys' Fees in Enabling Statutes or Conversion Statute

The Commissioner of Insurance has exclusive jurisdiction over the conversion proceedings and he must specify a reasonable treatment for the benefit of the citizens of Colorado of the value of the corporation. § 10–16–324(4)(e). Therefore, no suit could be brought in a court of general jurisdiction contesting the conversion. Since only a court has inherent equitable authority to award common fund fees, it is important to determine whether the legislature, in the en-

abling statutes, or by giving the Commissioner exclusive jurisdiction over the conversion proceeding, intended to abrogate the petitioners' common law right to fees.

It is well-settled that the legislature does not intend by a statute to make any change in the common law beyond what it declares by its express terms. *Preston v. Dupont*, 35 P.3d 433, 440 (Colo.2001). As such, unless the legislature clearly and unmistakably abrogates a remedy available at common law, we will not infer it. *Id.* at 440–41. Since we assume that petitioners have a common law right to attorneys' fees, and because nothing in section 16–11–324 or the enabling statutes expressly nullifies that right, the legislature did not abrogate petitioners' right to attorneys' fees.

We also note that the Commissioner's duty to transfer the fair market value to the Foundation, section 10–16–324(e)(I)(A), does not evidence an implicit legislative intent that the Commissioner cannot award attorneys' fees because such an award would necessarily reduce the value transferred, either in principal or interest. Indeed, we have already considered and rejected the same argument in the context of a common fund attorneys' fee award. *Pensioners Protective Ass'n v. Davis*, 112 Colo. 535, 150 P.2d 974 (1944). In *Davis*, the State Board of Public Welfare diverted funds from the Old Age Pension, and pensioners filed a class action to retrieve the illegal diversion. *Id.* at 537, 150 P.2d 974. We had already adjudged the transfers illegal, and ordered the funds restored to the pension. *Id.* When the attorneys sought compensation from the restored fund, we explained that but for the thoughtfulness and painstaking efforts of attorney-petitioners, there would not have been any restoration. *Id.* at 539, 150 P.2d 974. The trustees of the fund opposed payment, citing the inviolability of the pension fund. *Id.* at 538, 150 P.2d 974. However, we rejected the trustees' argument and stated that equity requires that we account for the improvement of the trust by the petitioners' advocacy. *Id.* at 539, 150 P.2d 974. Likewise, the Commissioner must recognize the enhancement of the charitable trust transferred to the Foundation, and it does not violate the

Commissioner's duty to transfer the fair market value to the Foundation when he also awards attorneys' fees.

### C. Conversion Proceedings are Equitable in Nature

A national trend for economically failing nonprofit entities to convert to for-profit entities has ensued, in large part, to gain access to capital available in equity markets. *See* Terri Roth Reicher, *Assuring Competent Oversight to Hospital Conversion Transactions*, 52 Baylor L.Rev. 83, 89 (2000). Because the assets of nonprofit entities, subsidized by taxpayers are charitable trusts, those assets must continue to serve charitable purposes because they belong to the community. *Id.* at 87–88.

Although a conversion may generally be contested in a court under common law charitable trust and cy pres doctrines, our legislature has provided the exclusive means to participate in a conversion through the conversion statute, divesting jurisdiction from courts. The conversion statute tracks the language of the transfer of a charitable trust in which the Commissioner must specify "a reasonable treatment for the benefit of the citizens of Colorado." Colorado citizens subsidized nonprofit health organizations, and section 10–16–301, 3 C.R.S. (2002), states the legislative policy for nonprofit hospital, medical-surgical, and health service corporations is "to promote the availability of hospital care, medical-surgical care, and other health services on a voluntary, nonprofit prepaid basis, and to thereby promote the health and welfare of the people of the state of Colorado."

Therefore, the charitable assets of the nonprofit are community assets, and must still benefit the citizens of the state of Colorado. Specifically, "[t]he charitable mission and grant-making functions of each qualifying entity [to which the charitable assets are transferred] must be dedicated to promoting or serving the health care needs of the citizens of Colorado." § 10–16–324(4)(e)(F). The language of section 10–16–324(4)(e) makes clear that the Commissioner is presiding over an equitable proceeding, previously available under the common law principles of cy pres.

When performing the conversion, the Commissioner effectively acts as a fiduciary of the charitable trust. The Restatement (Second) of Trusts defines a "charitable trust" as "a fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it, and subjecting the person by whom the property is held to equitable duties to deal with the property for a charitable purpose." Restatement (Second) of Trusts § 348 (1959). Because the Commissioner is acting as a fiduciary, he is empowered with the equitable duties to duly transfer the charitable assets for the purposes of the health care needs of the citizens of Colorado. However, we cannot go so far as to hold that he has all the powers of equity when he serves as a fiduciary. Rather, what he has available are all the powers necessary to effectuate the equitable purpose of the conversion that are not otherwise prohibited or abrogated by our legislature.

We next address the important question of whether intervenors in an administrative proceeding may ever perform a necessary function, warranting attorneys' fees under the common fund doctrine. Intervenors, at times, provide material information necessary to effectively complete a statutory mandate. We have already shown in the PUC cases that intervenors have led to refunds to ratepayers due to overcharges. *See also* Ernest Gellhorn, *Public Participation in Administrative Proceedings*, 81 Yale L.J. 359 (1972) (public participation in administrative agencies sacrosanct); *Federal Agency Assistance to Impecunious Intervenors*, 88 Harv. L.Rev. 1815 (1975); Carl W. Tobias, *Of Public Funds and Public Participation: Resolving the Issue of Agency Authority to Reimburse Public Participants in Administrative Proceedings*, 82 Colum. L.Rev. 906 (1982); *but see,* Jim Ross, *Participation Costs Run Amok: The Costs of Mass Participation for Deliberative Agency Decisionmaking*, 92 Nw. L.Rev. 173 (1997) (arguing that mass public participation may increase the breadth of discussions, but not depth). Whether petitioners' intervention was necessary for the Commissioner to perform the conversion is for him to decide in the first instance.

We do note, however, that the conversion of Blue Cross is a question of great importance to the public because the nonprofit prior to conversion was both a major health insurer and a charitable trust. An improper conversion, leading to a loss of the assets, either through an improper fair market evaluation or through the use of assets for purposes other than health care, could detrimentally impact the underserved's health care needs. Therefore, public participation is highly relevant in this context. Indeed, our General Assembly recognized that the public interest representation was crucial, and expressly provided for compensation of the Testimonial Staff. § 10–16–324(5).

However, it is unpersuasive that the Testimonial Staff alone sufficiently represented the public interest because the public interest is multi-faceted. Separate public interest representation may yield an improved conversion. *See* Gellhorn, *supra.* Additionally, the record demonstrates that the Testimonial Staff and petitioners did not always present the same advice to the Commissioner. Finally, we reiterate that the Commissioner made no assessment as to the necessity of petitioners' representation in the conversion proceeding, and therefore we leave to him that determination.

In making his evaluation as to whether the petitioners were "necessary," the Commissioner must account for the public interests at stake; that the conversion proceeding is equitable; that the intervenors seek remedies in equity; and that it is a quasi-adjudicatory proceeding. Further, the Commissioner should consider whether compensation is proper where the intervenors' representation of the public interest and for the public benefit provided as great or a greater benefit to the conversion proceeding, than did the Testimonial Staff a group the General Assembly already recognizes as integral to a proper conversion.

## C. Commissioner of Insurance Has Implied and Incidental Powers to Award Attorneys' Fees Under Common Fund Doctrine

We repeat that the legislature gave broad authority to the Division of Insurance and its Commissioner to regulate the business of insurance in a just and reasonable manner. One express task delegated, relating to the business of insurance, is to preside over the conversion of a nonprofit health insurance company to a for-profit corporation. When the legislature enacted the conversion statute and gave the Commissioner exclusive jurisdiction, it also gave the Division and its Commissioner the authority to be just and reasonable in the conversion.

Similar to the narrow PUC holdings in which public utility commissions of various states, including Colorado, have the incidental and implied authority to award common fund attorneys' fees, we hold that the Commissioner of Insurance in an equitable quasi-judicial administrative proceeding, in which he effectively serves as fiduciary, has here the implied and incidental authority to award attorneys' fees when public interest intervenors are necessary to effectuate the express mandate. This holding considers the absence of limits on the Division's and Commissioner's broad authority and the absence of abrogation of a common law right to common fund fees by the General Assembly in either the enabling act or the conversion statute.

## D. The Commissioner Does Not Have Authority to Award Fees for Lobbying Efforts before the General Assembly Prior to the Enactment of the Conversion Statute

The Commissioner's implied authority to award common fund fees emanates primarily from the conversion statute. Because the legislative work by petitioners, and for which they seek compensation, was completed prior to enactment of the conversion statute, it necessarily means that the Commissioner does not have jurisdiction to award common fund fees for lobbying efforts. In comparison, courts, under inherent powers may grant attorneys' fees for work completed before the court's jurisdiction was invoked, *see Winton v. Amos,* 255 U.S. 373, 394–95, 56 Ct.Cl. 472, 41 S.Ct. 342, 65 L.Ed. 684 (1921) (allowing attorneys' fees in equity

for legislative work substantially instrumental in creating a fund, citing *Trustees v. Greenough,* 105 U.S. 527, 26 L.Ed. 1157 (1881)); *Wininger v. SI Management,* 301 F.3d 1115 (9th Cir.2002) (district court may award common fund fees for work prior to litigation and stating that it is not the relatedness between the non-litigation work and the later litigation that warrants fees, but the extent to which the non-litigation work was calculated, and, in fact did, bring about the common fund); however, the Commissioner of Insurance does not have available to him the power to do equity apart from the legislative scheme, and therefore, his authority does not reach activity conducted prior to the inception of his power.

## VII. Conclusion

■■■ We determine today that section 10–16–324(4)(e) accomplishes the equivalent of the cy pres doctrine. As such, during conversion of a nonprofit health care insurer to a for-profit corporation, the Commissioner presided over proceedings that are equitable in nature and served as a fiduciary for the funds transferred to the Caring for Colorado Foundation. Because the legislature empowered the Commissioner to do whatever is necessary to accomplish the conversion, we hold that the Commissioner can award attorneys' fees under the common fund doctrine when there is no legislative abrogation of the common law right; where the legislature does not otherwise prohibit an award of fees; and where the participation of the intervenors, representing the general public interest, was necessary to effectuate the conversion.

We leave to the Commissioner's initial determination the following questions: whether petitioners' efforts were necessary to effectuate the conversion and substantially responsible for enhancing the consideration paid by Anthem to Foundation of $55 million; whether a percentage-based award of fees is appropriate; and whether petitioners should receive compensation for nonpecuniary benefits to the conversion process.

Accordingly, we reverse the judgment of the court of appeals and remand this case to that court for return to the Commissioner of Insurance for further proceedings consistent with this opinion.

Justice RICE dissents, and Justice KOURLIS joins in the dissent.

Justice COATS does not participate.

Justice RICE dissenting:

I respectfully dissent. The majority concludes that the Insurance Commissioner may have the implied statutory authority to award attorney fees to several intervenors. Because I find no basis for such authority in this case, I would affirm the court of appeals.

## I. FACTS

This case arises out of the 1999 conversion of Rocky Mountain Hospital and Medical Service, d/b/a Blue Cross and Blue Shield of Colorado, from a non-profit to a for-profit corporation. Petitioners, Taylor Hawes and the Colorado Health Care Conversions Project, and their respective attorneys, Kelly, Haglund, Garnsey and Kahn, LLC and the Colorado Center on Law and Policy (collectively, "Petitioners"), seek recovery of attorney fees in connection with their work on the conversion.

In 1996, Blue Cross began planning for a conversion from a non-profit to a for-profit corporation. In response, the General Assembly enacted legislation designed to regulate such a conversion ("conversion statute"). Ch. 300, sec. 1, § 10–16–324, 1996 Sess. Laws 1861. The legislation required, among other things, that the converting corporation pay an amount equal to its fair market value to a newly created charitable entity which would be "dedicated to promoting or serving the health care needs of the citizens of Colorado." § 10–16–324(4)(e)(I)(F), 3 C.R.S. (2002). Petitioners actively lobbied for the passage of the bill and were apparently successful in getting certain provisions into the final version of the legislation.

Over the course of the next three years, Blue Cross worked to create an acceptable conversion plan. During that time, Petitioners were actively involved in the process by, among other things, participating in public

hearings, consulting with experts, and presenting information to the Commissioner.

On November 5, 1999, the Commissioner of Insurance approved the Blue Cross conversion plan. Blue Cross converted into a for-profit entity and issued shares of stock, all of which were acquired by Anthem West, Inc., a wholly owned subsidiary of Anthem Insurance Companies, Inc. Pursuant to the conversion statute, Anthem paid $155 million (the fair market value of Blue Cross) to the Caring for Colorado Foundation (the "Foundation"), a nonprofit corporation created to receive and use the funds to serve the health care needs of Colorado citizens.

After the conversion, Petitioners applied for an award of attorney fees to be paid from the $155 million which Anthem contributed to the Foundation. Petitioners argued that this amount was a common fund which had been created and enlarged, at least in part, because of their work. Specifically, Petitioners contend that their efforts enhanced the common fund by $55 million. Based on this estimate, Petitioners requested attorney fees of $2.75 million, a figure equal to five percent of this enhancement. In addition, Petitioners requested expert witness fees and out-of-pocket costs totaling approximately $78,000.[1]

Petitioners contend that their efforts increased the amount of consideration paid by Anthem to the Foundation; that they were instrumental in ensuring that costs of conversion were paid by Blue Cross, rather than the Foundation; and that they caused significant improvements in the governance and organization of the Foundation. For the purpose of this proceeding, we assume that these claims are true.

The Commissioner, after examining the scope of an administrative agency's equitable powers, concluded that he did not have the statutory authority to award attorney fees to Petitioners. The court of appeals agreed, rejecting Petitioners' contention that the authority to award attorney fees should be implied from the statute. *Hawes v. Colo. Div. of Ins.,* 45 P.3d 763 (Colo.App.2001).

We granted certiorari to address the question of whether the court of appeals erred when it affirmed the Insurance Commissioner's conclusion that he was without authority to award attorney fees under the common fund doctrine.

## II. THE SCOPE OF AGENCY AUTHORITY

An administrative agency only has the power and authority conferred upon it by the General Assembly; acts which exceed the scope of its delegated powers are void. *Flavell v. Dept. of Welfare,* 144 Colo. 203, 355 P.2d 941 (1960); *City and County of Denver v. Gibson,* 37 Colo.App. 130, 546 P.2d 974 (1975).

In addition, an administrative agency is not a court; it is not vested with the same broad equitable power which a court possesses. *See* 73 C.J.S. *Public Administrative Law and Procedure* § 33 (1983) ("As a general rule, administrative agencies have no general or inherent judicial powers"); *Admiral–Merchants Motor Freight, Inc. v. United States,* 321 F.Supp. 353, 359 (D.Colo.1971) ("[A] legislative tribunal cannot exercise common law or equity jurisdiction unless this authority is expressly granted by the Congress."); *Feistman v. Comm'r,* 587 F.2d 941 (9th Cir.1978) ("When the Tax Court was an administrative agency, it was without the ancillary equitable powers ordinarily exercised by a true court."); *Ramos v. Dist. of Columbia Dept. of Consumer and Regulatory Affairs,* 601 A.2d 1069, 1073 (D.C.1992) ("Administrative law judges only possess narrowly defined statutory and regulatory powers; they do not have the traditional equity power of courts to formulate remedies.").

Finally, an award of attorney fees under the common fund doctrine is an equitable remedy. *See Kuhn v. State,* 924 P.2d 1053, 1059 (Colo.1996). The doctrine is an exception to the general rule that each party normally pays his own attorney fees and costs and is grounded in the equitable principles of quantum meruit and unjust enrichment. *Id.*

---

1. The attorney fees, expert witness fees, and out-of-pocket expenses requested by Petitioners includes compensation for lobbying before the legislature prior to the enactment of the conversion statute.

Therefore, because administrative agencies lack inherent or common law authority to bestow equitable remedies, and the power to grant attorney fees under the common fund doctrine is, undoubtedly, an equitable power, the Insurance Commissioner only has the authority to award attorney fees in this case if the General Assembly has expressly provided the authority or if such authority can be reasonably implied. I find neither express nor implied authority here.

## A. Express Authority

Petitioners concede that the Insurance Commissioner does not have express authority to award attorney fees in this case.

The office of the Insurance Commissioner was established by the Colorado Constitution. Colo. Const. art. IV, § 23. The general powers and duties of that office are enumerated in section 10–1–108. § 10–1–108, 3 C.R.S. (2002). In addition to the general powers and duties listed in section 10–1–108, the Insurance Commissioner (and the corresponding Division of Insurance) are vested with additional powers and duties in certain circumstances specified throughout C.R.S. Title 10. Finally, the Commissioner is subject to the provisions of the State Administrative Procedure Act. §§ 24–4–101 to –108, 7A C.R.S. (2002).

There is nothing in any of these governing documents—Article IV of the state constitution, Title 10 of the legislative code, or the Administrative Procedure Act—which expressly authorize the Insurance Commissioner to award attorney fees in this context.

The lack of express authority is significant when one considers that the General Assembly has, on frequent occasions, seen fit to expressly authorize other administrative agencies to award attorney fees. See, e.g., § 24–50–125.5, 7A C.R.S. (2002) (state personnel board has authority to award attorney fees to prevailing party where action was brought frivolously, in bad faith, maliciously, or as means of harassment); § 34–33–124(5), 9 C.R.S. (2002) (mined land reclamation board has authority to award attorney fees as it "deems just and proper"); § 34–60–118.5(6), 9 C.R.S. (2002) (oil and gas conservation commission may award cost of

attorney fees to the prevailing party in an administrative proceeding). If the General Assembly intended to empower the Insurance Commissioner to award attorney fees, it knew well how to do so.

## B. Implied Authority

Because there is no express authority in this case, the next question is whether the power to award attorney fees may be reasonably implied from the statute. Unlike the majority, I conclude that it may not.

Powers not expressly granted to a regulatory agency will be implied only if such powers are necessary to carry out the agency's function. *Colorado State Bd. of Land Comm'rs v. Colorado Mined Land Reclamation Bd.*, 809 P.2d 974, 983 (Colo.1991) ("A statutory delegation of authority . . . confers 'all implied powers reasonably necessary to the proper exercise of the delegated power.'" (*quoting Beaver Meadows v. Bd. of County Comm'rs*, 709 P.2d 928, 932 (Colo.1985))); *State Farm Mut. Auto. Ins. Co. v. Barnes*, 41 Colo.App. 380, 585 P.2d 929 (1978); 2 Am. Jur.2d *Administrative Law* § 62 (1994).

As such, the resolution of this case depends on the definition of the term, "necessary." Courts disagree on what powers will be deemed necessary to fulfill an agency's function. *See* 2 Am.Jur.2d *Administrative Law* § 62 (1994); *compare Lake County Bd. of Review v. Prop. Tax Appeal Bd.*, 119 Ill.2d 419, 116 Ill.Dec. 567, 519 N.E.2d 459, 463 (1988) ("[T]he word 'necessary' is a word of great flexibility and may mean . . . 'expedient' or 'reasonably convenient.' Further, wide latitude must be given to administrative agencies in fulfilling their duties.") *and Univ. Police Officers Union, Local 567 v. Univ. of Nebraska*, 203 Neb. 4, 277 N.W.2d 529 (1979) ("The authority which is necessary [for an administrative agency] to accomplish the purposes of an act must be narrowly construed.").

In the context of this case, an understanding of what is "necessary" in order for the commissioner to fulfill his function is best gained by reference to the conversion statute itself. By analyzing the Commissioner's statutory responsibilities, we can determine

whether the power to award attorney fees, over and above that expressly provided by the statute, was "necessary" to accomplish the purposes of the Act.

In this case, the Insurance Commissioner's function was to ensure that the conversion plan was accomplished in accordance with statutory requirements and not contrary to the interests of subscribers, contract holders, and the general public. *See* § 10–16–324(9), 3 C.R.S. (2002). Throughout the conversion process, the statute assigns the Commissioner an integral role.

First, the statute requires the converting corporation to file a plan of conversion with the Commissioner. § 10–16–324(3). Subsection (4) of the statute describes the information that must be contained within the conversion plan. § 10–16–324(4). Most importantly, the plan must provide for the payment of reasonable consideration to a charitable "qualifying entity" for the purpose of "serving the health care needs of the citizens of Colorado." § 10–16–324(4)(e)(I)(F). The amount of payment is deemed to be reasonable if consideration, determined by the Commissioner to be equal to the fair market value of the corporation, is conveyed to the qualifying entity. § 10–16–324(4)(e)(I)(A). In addition, the qualifying entity must be constructed so as to avoid immediate dilution of its stock ownership and ensure its independence from the converting corporation. § 10–16–324(4)(e)(I)(D), (E).

Next, the corporation must provide notice regarding the proposed conversion to all its current subscribers as well as the public at large. § 10–16–324(6). The form and manner of the notice must be approved by the Commissioner. *Id.*

Finally, the Commissioner must hold a hearing regarding the proposed conversion. § 10–16–324(7). Within sixty days following the hearing, the Commissioner must issue an order approving or disapproving the proposed plan or approving an amended plan. *Id.*

The Commissioner has significant discretion to ensure that the conversion plan is "fair and reasonable" and not contrary to the interests of "subscribers, contract holders, and the public." § 10–16–324(9)(b). Because of the complexity involved in a conversion, the General Assembly recognized that the Commissioner and his staff may be ill-equipped to competently and efficiently fulfill the Commissioner's statutory duties. To alleviate this concern, the legislature created a mechanism to allow the Commissioner to obtain advice from outside experts, including attorneys, at the expense of the corporation:

> The commissioner may retain, upon notice to the corporation, any qualified expert, such as *attorneys,* accountants, actuaries, and financial analysts, not otherwise a part of the commissioner's staff, to assist in reviewing the proposed plan, *with such reasonable expenses incurred during the review to be borne by the corporation.*

§ 10–16–324(5), 3 C.R.S. (2002) (emphasis added).

Throughout the conversion process, the Commissioner took advantage of this provision and received the advice of several experts. The Commissioner was assisted by the staff of the Division of Insurance and attorneys within the Attorney General's office, he received reports from a private actuary and a private financial consultant, and he was advised throughout the proceedings by two certified public accountants (collectively, "Testimonial Staff").

In light of the fact that the General Assembly specifically provided an avenue for the Commissioner to obtain exactly the sort of expertise and advice the intervenors provided, I cannot conclude that the power to award attorney fees to the intervenors, over and above the fees and costs of the Testimonial Staff, was necessary to allow the Commissioner to fulfill the express mandate of the statute.

In my view, Colorado courts have generally been reluctant to imply administrative agency authority in the absence of clear legislative intent. *See, e.g., Bd. of Med. Exam'rs v. Duhon,* 895 P.2d 143 (Colo.1995) (Board of Medical Examiners did not have authority to issue subpoena duces tecum other than in the two situations specifically mentioned in the statute); *Telluride Reg'l Airport Auth. v. Bd. of Equalization,* 789 P.2d

201 (Colo.App.1989) (State Board of Equalization did not have authority to revise determination of tax exemption made by county board of equalization); *State Farm Mut. Auto. Ins. Co. v. Barnes,* 41 Colo.App. 380, 585 P.2d 929 (1978) (where statute vested authority in the Insurance Commissioner to approve or disapprove a proposed rate increase, Commissioner was without express or implied authority to set a cap on the maximum allowable rate); *City and County of Denver v. Gibson,* 37 Colo.App. 130, 546 P.2d 974 (1976) (where city charter authorized Civil Service Commission to conduct and supervise tests of eligible candidates for Police Department vacancy, the Commission did not have the authority to order that a certain candidate be promoted); *Bd. of Barber Exam'rs v. White,* 29 Colo.App. 471, 485 P.2d 928 (1971) (where statute provided for Board control over licensing of barbers, the Board was without authority to issue rules and regulations concerning product demonstrations and training classes).

The majority, however, shows no reluctance to imply broad agency authority in this case. Although the General Assembly established a procedure to provide expert advice to the Commissioner, the majority concludes that this procedure may have been insufficient and that "[s]eparate public interest representation may yield an improved conversion." Maj. Op. at 1022–1023. However, the issue is not whether the intervenors' representation may have been useful or helpful; the issue is whether it was necessary for the Commissioner to award them attorney fees, over and above the fees awarded to the Testimonial Staff, in order to accomplish the purpose of the statute.

Moreover, in its eagerness to expand the implied powers of the Insurance Commissioner, the majority fails to provide a discernible standard for determining whether an agency power is "necessary."[2] Instead, the majority simply urges the Commissioner to recognize that the proceeding is "equitable" and to "account for the public interests at stake." Maj. Op. at 1023. In addition, the Commissioner is advised that the power to award fees is necessary if the intervenors' work "provided as great or a greater benefit to the conversion proceeding, than did the Testimonial Staff." *Id.* This test for determining the scope of an agency's authority has no support in the language of the statute, its legislative history, or any prior caselaw; rather, this is nothing more than judicial fiat.

## III. CONCLUSION

The majority's broad reading of an agency's implied powers makes it necessary to remand the case to the Insurance Commissioner for additional factual findings. Because I would continue to adhere to a more strict interpretation of an agency's implied powers, I believe no such remand is necessary. Based on the record before us, I would rule, as a matter of law, that the Insurance Commissioner lacked authority, either express or implied, to award attorney fees to the Petitioners.

I am authorized to state that Justice KOURLIS joins in this dissent.

---

**2.** While I agree with the majority that the scope of an agency's implied powers will depend, to some extent, on the particular facts of the case, I would not abdicate this court's responsibility to define the limits of an agency's authority. *See Social Security Bd. v. Nierotko,* 327 U.S. 358, 369, 66 S.Ct. 637, 90 L.Ed. 718 (1946) ("An agency may not finally decide the limits of its statutory power. That is a judicial function.").